STATE of Wisconsin, Plaintiff-Respondent,

v.

James B. SHILLCUTT, Defendant-Appellant-Petitioner.

Supreme Court

*No. 83–528–CR. Argued April 26, 1984.—Decided June 29, 1984.*

(Also reported in 350 N.W.2d 686.)

For the defendant-appellant-petitioner there were briefs and oral argument by *Mark Lukoff,* first assistant state public defender.

For the plaintiff-respondent the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J.   This is a review of a decision of the court of appeals[1] affirming an order of the circuit court for Winnebago county, Honorable Robert A. Hawley, Circuit Judge, denying the defendant's motion for a new trial. Three issues are presented on this review: (1) Is a juror's statement during jury deliberations that the trial court found "could be characterized as a racial slur" competent evidence under sec. 906.06(2), Stats., 1981–

---

[1] *State v. Shillcutt,* 116 Wis. 2d 227, 341 N.W.2d 716 (Ct. App. 1983).

1982;[2] (2) does the juror's comment made in this case require reversal of the conviction as a matter of fundamental fairness; and (3) does a denial by this court of a court of appeals' request for certification have any authoritative value on the merits of the case.

We conclude: (1) The juror's statement during jury deliberations in this case is not competent evidence under sec. 906.06(2), Stats. 1981–1982; (2) the comment made in this case does not require reversal of the conviction as a matter of fundamental fairness; and (3) denial by this court of certification has no precedential value on the merits of the case.

This case involves allegations that racial prejudice so affected the jury's guilty verdict that it must be overturned. Presumptions of criminal activity because of race have no place in our jurisprudence. Races do not commit crimes, individuals commit crimes and must be judged as individuals according to the evidence. The problem is how best to approach this ideal and at the same time preserve that great guarantor of our civil liberties and civil rights, the American jury system.

James B. Shillcutt (defendant) was convicted by a jury of soliciting prostitutes[3] and keeping a place of prostitu-

---

[2] "906.06. Competency of juror as witness. . . . (2) INQUIRY INTO VALIDITY OF VERDICT OR INDICTMENT. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received."

[3] "944.32. Soliciting prostitutes. Whoever intentionally solicits or causes any person to practice prostitution or establishes any

tion.[4] He was sentenced to two consecutive five year prison terms.

Subsequent to trial, the defense made a motion for a new trial. The motion was supported by an affidavit from one of the jurors stating that during the deliberation one of the jurors had commented: "Let's be logical, he's a black, and he sees a seventeen year old white girl— I know the type." The affidavit also stated that after this comment was made, "one of the female members of the jury agreed with the statement."

The juror's comment apparently has reference to Melody Plante, the chief witness for the prosecution, who testified at trial that she first met the defendant in 1979 when she was seventeen years old. At that first meeting, the defendant asked Ms. Plante if she wished to become an "exotic" dancer . Ms. Plante agreed and began dancing at engagements in bars arranged by the defendant. Money paid to Ms. Plante for these dancing engagements was turned over to the defendant.

Shortly after she began dancing, the defendant told her: "I want you to talk to guys in the bar and see if any of them want to go to bed." When Ms. Plante refused, the defendant "slapped [her] around a little bit." Thereafter she began "dating." She testified that during the time she was "working for the defendant," she engaged in approximately ninety to one-hundred acts of prostitution. Money paid to her was turned over to the defendant. The defendant paid rent and utility bills for the Oshkosh

person in a place of prostitution is guilty of a Class D felony. If the person is under the age of 18, the defendant is guilty of a Class C felony."

[4] "944.34. **Keeping place of prostitution.** Whoever intentionally does any of the following is guilty of a Class D felony:

"(1) Keeps a place of prostitution; or

"(2) Grants the use or allows the continued use of a place as a place of prostitution."

apartment where Melody Plante lived and provided her with food, clothing and drugs.

Ms. Plante testified to a number of instances of physical abuse by the defendant. She testified that the defendant had burned her when he, in her words, "stuck my curling iron up inside of me," that on one occasion she had to be hospitalized when she fell and hit her head on a desk after the defendant had hit her, and that the defendant once threatened her with a gun.

The testimony also showed that the defendant acted as booking agent for a number of other dancers, one of whom was black.

A hearing was held in which the trial court questioned the affiant juror about the contents of the affidavit. The juror testified that the comment was made in the presence of all the other jurors approximately fifteen to twenty minutes before the jury came back. She testified that after the quoted statement was made, a second juror responded: "A man like that isn't capable of loving anybody." This is the statement referred to in the affidavit as showing that "one of the female members of the jury agreed with the [first juror's] statement." Defense counsel conceded at oral argument that this statement does not evince racial prejudice. She also testified that she had no recollection of any other references to race made during the deliberation.

After taking the testimony of the juror and listening to the arguments of counsel, the trial court denied the motion for a new trial stating: "[A]lthough [the statement] could be categorized as a racial slur, the court does not find by clear, satisfying evidence convincing proof that this information would be prejudicial to a hypothetical jury . . ."

The defendant appealed to the court of appeals which certified the case to this court under sec. (Rule) 809.61, Stats. 1981–1982. The request for certification was denied. The court of appeals then affirmed the trial court's

denial of the motion for a new trial basing its decision in part on the fact that this court had earlier denied certification. This court accepted defendant's petition for review.

In two prior cases involving impeachment of jury verdicts by testimony from jurors, this court has prescribed a three step procedure for determining when a verdict should be overturned. The first two steps involve evidentiary questions: (1) Is the proffered evidence competent under sec. 906.06(2), Stats. 1981–1982; and (2) does the evidence show error, that is, substantial grounds sufficient to overturn the verdict. (3) The third question is whether the party seeking to impeach the verdict was prejudiced requiring that the verdict be upset. *State v. Poh*, 116 Wis. 2d 510, 515–516, 343 N.W.2d 108 (1984) ; *After Hour Welding v. Laneil Management Co.*, 108 Wis. 2d 734, 738, 324 N.W.2d 686 (1982). Because we conclude that the proffered evidence is not competent under sec. 906.06(2), we do not reach the second and third steps of the analysis under the statute of whether there was error or the defendant was prejudiced.

When the affidavit of a juror as to the misconduct of himself or other members of the jury is used as the basis of a motion for a new trial, "the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what happened in the jury room." *McDonald v. Pless*, 238 U.S. 265, 267 (1915). Section 906.06(2), Stats., seeks to reach an accommodation between these sometimes competing policies. The statute lays down as a general rule that "a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in con-

nection therewith." This general rule of juror secrecy fosters a number of valued public policies including: (1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; and (5) maintaining the viability of the jury as a judicial decision-making body. *Government of Virgin Islands v. Gereau,* 523 F.2d 140, 148 (3rd Cir. 1975), *cert. denied,* 424 U.S. 917 (1976).

Important as the policies underlying jury secrecy are, there are situations where these interests must give way to the competing interest in ensuring a fair trial and a just resolution of the issues in the individual case. The statute accommodates the two opposing policies by making an exception to the general rule of incompetence for juror testimony "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." The question in this case is whether the statement made by one of the jurors during jury deliberations falls under the rule or the exception. The two matters as to which a juror is competent to testify under the statute are "extraneous prejudicial information" and "outside influence." In order for the juror's remark in this case to be competent it must fall under one of those two categories.

The meaning of the word "extraneous" as defined in *Webster's Third New International Dictionary* is "existing or originating outside or beyond: external in origin: coming from the outside." The dictionary defines "information" as "knowledge communicated by others or obtained from investigation, study, or instruction" or "knowledge of a particular event or situation." Thus, "extraneous prejudicial information" is knowledge coming from the outside which is prejudicial. The juror in

this case stated: "Let's be logical, he's a black, and he sees a seventeen year old white girl—I know the type." The juror did not explain what "type" he had in mind. Whatever factual content the other jurors gave to this statement had to be supplied from their own catalogue of "types" rather than from the statement itself. The juror's statement here does not fall under the category of extraneous prejudicial information.[5]

Likewise this statement does not fall under the category of "outside influence." Whatever influence there might have been in the statement was not imposed on the jury from outside by a third party either to or through a juror or jurors.

This court has twice within the past two years addressed the question of the competency of a juror's testimony to impeach his own verdict. In *After Hour Welding v. Laneil Management Co.*, the losing party in a civil lawsuit attempted to impeach the jury's verdict with an affidavit from a juror stating that during jury deliberations comments were made by jurors which (1) referred to the officer of the defendant corporation and sole defense witness as a "cheap Jew"; (2) stated that his son, an attorney, had defended the "Outlaws," a motorcycle gang; and

[5] The dissenting opinion of Justice Bablitch argues that the juror statement is admissible under sec. 906.06(2), Stats. as evidence of the introduction of an extra-record *fact*. (*Infra,* pp. 831–32.) The "fact" which is said to be contained in the statement is that "the way black pimps work is to get young white girls working for them and that's what happened in this case." (Pp. 831–32.) Even if we were to accept this characterization of the remark, there is no logical force in the statement tending to show that the defendant is guilty. The purported extra-record "fact" is that "black pimps . . . get young white girls working for them. . . ." The dissent seems to imply that it logically follows from this statement that if X is black then X is a pimp. It does not. It no more follows as a logical conclusion from this statement that a black man is pimp than it follows that a young white girl is a prostitute.

(3) stated that the father and son had been involved in the suicide of a local judge. On the issue of the competency of the proffered evidence, this court affirmed the court of appeals' decision holding all three allegations were competent. The court, while not specifically addressing the question of whether the reference to religion was "extraneous prejudicial information" under the statute, stated: "Whenever it comes to a trial court's attention that a jury verdict may have been the result of any form of prejudice based on race, religion, gender or national origin, judges should be especially sensitive to such allegations and conduct an investigation to 'ferret out the truth.'" 108 Wis. 2d at 739–740 (quoting *Morgan v. United States,* 399 F.2d 93, 97 (5th Cir. 1968) ; *cert. denied* 393 U.S. 1025 (1969). The court further stated: "For even if only one member of a jury harbors a material prejudice, the right to a trial by an impartial jury is impaired." 108 Wis. 2d at 740. The court also held that the juror statements constituted substantial grounds sufficient to set aside the verdict. The court remanded the case to the trial court to conduct a hearing to determine the circumstances under which the statements were made and determine as a matter of law the probable effect of the statements on a hypothetical average jury.

This court also addressed the competency of juror testimony under sec. 906.06(2), Stats., to impeach a verdict in *State v. Poh.* That case involved statements about the defendant's alleged prior record of drinking and driving made by jurors during deliberations in a criminal trial for homicide by negligent operation of a vehicle while under the influence of an intoxicant. In discussing the competency issue, the court stated:

"Jurors are expected to bring commonly known facts and their experiences to bear in arriving at their verdict. We cannot 'expunge from jury deliberations the subjective opinions of jurors, their attitudinal expositions or

their philosophies. These involve the very human ele-
ments that constitute one of the strengths of our jury
system.' *United States v. McKinney,* 429 F.2d 1019,
1022–23 (5th Cir. 1970).

"Nevertheless, a fundamental principle of our justice
system is that the government has the burden of estab-
lishing guilt beyond a reasonable doubt on the basis of ev-
idence offered in the courtroom under the rules of
evidence and under the supervision of the court. While
the thirteenth century jury may have been selected be-
cause of its familiarity with background facts, the mod-
ern jury determines the merits of a case solely on the
basis of the evidence developed before it in the adversary
arena. 'The theory of our system is that the conclusions
to be reached in a case will be induced only by evidence
and argument in open court, and not by any outside influ-
ence, whether of private talk or public print.' *Patterson
v. Colorado,* 205 U.S. 454, 462 (1907)." 116 Wis. 2d at
519. (Footnotes omitted.)

In a footnote, the court quoted with approval language
from *United States v. McKinney,* 429 F.2d 1019, 1023
(5th Cir. 1970), *cert. denied,* 401 U.S. 922 (1970) where
it was stated:

"[W]hile the jury may leaven its deliberation with its
wisdom and experience, in doing so it must not bring
extra *facts* into the jury room. In every criminal case we
must endeavor to see that jurors do not [consider] in the
confines of the jury room . . . specific facts about the
specific defendant then on trial. . . . To the greatest ex-
tent possible all factual [material] must pass through the
judicial sieve, where the fundamental guarantees of pro-
cedural law protect the rights of those accused of crime.
(emphasis in original.)"

The court concluded that "[t]he information which the
jurors received was not the 'general knowledge' or 'the
jury wisdom' we expect jurors to bring to their task" but
rather "extraneous information within the meaning of
sec. 906.06(2)." 116 Wis. 2d at 521.

The federal courts have generally interpreted the comparable federal rule contained in Federal Rule of Evidence 606(b)[6] to prohibit impeachment of jury verdicts by juror testimony of statements made during jury deliberations evincing subjective prejudice or bias. In *United States v. Duzac,* 622 F.2d 911 (5th Cir.), *cert. denied,* 449 U.S. 1012 (1980) the defendant who had been convicted of lying to a grand jury and willfully depriving another of his civil rights challenged his conviction on the grounds of juror prejudice. Evidence of the prejudice came from a message sent during deliberations by the jury to the trial judge stating: "There are certain prejudices among this jury due to prior personal experiences that prevent us from arriving at a unanimous decision on Count I." The trial court responded to the note by reminding the jurors of their obligation to decide the case on the evidence and without regard to prejudice or sympathy. The trial court later interviewed the jury foreman about the note but denied the defendant's motion for a mistrial and did not hold an evidentiary hearing. The court of appeals refused to permit an inquiry into the verdict stating:

"The prejudice complained of is alleged to be the product of personal experiences unrelated to this litigation. The proper time to discover such prejudices is when the

---

[6] "Rule 606. *Competency of Juror as Witness.* . . . (b) *Inquiry into validity of verdict or indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about what he would be precluded from testifying be received for these purposes."

jury is being selected and preemptory challenges are available to the attorneys. Although the jury is obligated to decide the case solely on the evidence, its verdict may not be disturbed if it is later learned that personal prejudices were not put aside during deliberations." 622 F.2d at 913.

The Court of Appeals for the Fifth Circuit followed the holding in *United States v. Duzac* in *Martinez v. Food City, Inc.*, 658 F.2d 369 (5th Cir. 1981). That case involved an attempt to impeach a jury verdict in a civil suit with juror testimony as to an alleged juror statement that the losing party should be " 'taught a lesson' for hiring Mexican nationals holding green cards." The court concluded that the proffered testimony was not competent under Rule 606(b). "[J]uror testimony regarding the possible subjective prejudices or improper motives of individual jurors has been held to be within the rule, rather than within the exception for 'extraneous influences.' " 658 F.2d at 373 (citations omitted).

The Federal District Court for the Southern District of Iowa has likewise interpreted Federal Rule 606(b) as prohibiting evidence relating to subjective juror prejudices or motivations. In *Smith v. Brewer*, 444 F. Supp. 482 (S.D. Iowa), *aff'd.*, 577 F.2d 466 (8th Cir.) *cert. denied*, 439 U.S. 967 (1978), a juror alleged that one of the jurors had injected race into the deliberations by mimicking a black minstrel and using the "black dialect." The court held the proffered evidence incompetent stating:

"A general rule favoring the inadmissibility of juror testimony to impeach a verdict on the basis of alleged biased conduct occurring within the jury room is supported both by the language of Rule 606(b) and its legislative history. The Rule prohibits testimony as to 'any matter or statement,' occurring in the jury room, a prohibition qualified only to the extent such a matter or statement relates to extraneous information or outside influence. Conduct such as juror Burns engaged in cannot, in the usual

sense, be deemed either to impart information or reflect outside influence." 444 F. Supp. at 489.

The United States District Court for the Western District of New York held the Federal Rule did permit a juror's statement evincing racial bias in *Tobias v. Smith,* 468 F. Supp. 1287 (W.D. N.Y. 1979). The challenge to the verdict in that case was based on a juror affidavit stating that the jury foreman had remarked that one of the witness' failure to identify a photo of the black defendant "didn't matter because 'you can't tell one black from another. They all look alike.'" The affidavit also stated that another juror had said that the jury "should take the word of two white victims as opposed to this black defendant." 468 F. Supp. at 1289. The court held that the evidence was competent under the federal rule:

"Under Rule 606(b) of the Federal Rules of Evidence, and under the cases which the rule codifies, a court may receive evidence of the fact that extraneous prejudicial influences were improperly brought to the jury's attention. My conclusion is that the statements in the juror's affidavit are sufficient to raise a question as to whether the jury's verdict was discolored by improper influences and that they are not merely matters of jury deliberations." 468 F. Supp. at 1290.

The juror statement in *Tobias* is sufficiently different from the juror statement made here that the holding in *Tobias* is not useful precedent for this case.

We conclude based on our reading of sec. 906.06(2) and the cases interpreting this and the comparable federal rule that juror statements made here during jury deliberations are not competent evidence to impeach the jury's verdict. The statute prohibits a juror from testifying "to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent or dissent from the verdict . . ." This statement can only be understood

as forbidding an inquiry by the court into a juror's sub-
jective motives for voting the way he did. The rule
against a juror's impeaching his own verdict has been ap-
plied to prohibit inquiry into an allegation that jurors
misunderstood or intentionally misapplied the law,[7] that
the jurors misunderstood the charge for which the de-
fend was on trial,[8] that a juror was coerced or pressured
by other jurors,[9] that jurors were upset or otherwise dis-
tracted,[10] and that the verdict was arrived at by means of
compromise[11] or averaging of juror estimates of dam-
ages.[12] One prominent commentator has noted that the

[7] *United States v. Stacey*, 475 F.2d 1119 (9th Cir. 1973) ; *United States v. D'Angelo*, 598 F.2d 1002, 1003 (5th Cir. 1979) : "The possibility that the jury misunderstood or even intentionally mis-applied the law . . . does not warrant reversal of the conviction."

[8] *United States v. Chereton*, 309 F.2d 197, 201 (6th Cir.) *cert. denied*, 366 U.S. 924 (1962) :

"It is one thing for jurors to make a unanimous mistake in respect to a matter actually submitted to them. It is something entirely different for individual jurors to claim that they found defendant guilty of an offense which was never submitted to them for their determination. The alleged mistake in this case was not made by all the jurors."

[9] *Johnson v. Hunter*, 144 F.2d 565 (10th Cir. 1944) ; *United States v. Kohne*, 358 F. Supp. 1046, 1050 (W.D. Pa. 1973) : "It is generally held that jurors may not impeach their verdict by testi-mony that it resulted from coercion or a majority vote."

[10] *United States v. Dioguardia*, 492 F.2d 70 (2nd Cir.) *cert. denied*. 419 U.S. 873 (1974) ; *United States v. Kohne*, 358 F. Supp. at 1051: "Thus it would seem that if Tisak agreed to verdicts be-cause he was concerned about his erratic oil heater, or his dogs and cat, or the conduct or statements of other jurors, and was anxious to get home, such would be insufficient to impeach the verdicts."

[11] *United States v. Marques*, 600 F.2d 742 (9th Cir.) *cert. denied*, 444 U.S. 858 and 444 U.S. 1019 (1979) ; *United States v. Green*, 523 F.2d 229, 235–236 (2nd Cir. 1975) *cert. denied*, 423 U.S. 1074 (1976) : "Evidence that the jurors on their own agreed to a compromise verdict does not warrant a new trial."

[12] *McDonald v. Pless*, 238 U.S. 264 (1915).

problem that arises when there are allegations of prejudicial comments during deliberations is whether proof of the statements can be separated from proof of the jury's subjective motives or the effects of the statements on the jury's minds. Given this difficulty "[g]enerally, it seems better to draw [the line] in favor of juror privacy; in the heat of juror debate all kinds of statements may be made which have little effect on outcome, though taken out of context they seem damning and absurd." 3 J. Weinstein & M. Berger, *Weinstein's Evidence*, sec. 606(04) (1976).

The sixth amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution to a trial by an impartial jury. This case does not present the question of whether the right to jury impartiality is to be honored. It is. The question posed by this case has to do only with the best means for achieving that unquestionably desirable end.

The right to trial by an impartial jury includes at least two separate rights: the right to be tried by a jury and the right to be tried by a jury which is impartial. The task presented by this case is to find the means of guaranteeing the latter, impartiality, without so crippling or altering the institution of the jury as to deny the former, the right to be tried by a jury.

Secrecy of jury deliberations is fundamental to the type of free debate and conflict of views that is the very essence of jury decision making. As one commentator has put it: "The precise value of throwing together in a jury room a representative cross-section of the community is that a just consensus is reached through a thoroughgoing exchange of ideas and impressions."[13] It has been frequently noted that if the process is to work according to theory, the participants must feel completely free to dis-

---

[13] Note *"Public Disclosure of Jury Deliberations,"* 96 Harvard L. Rev. 886, 890 (1983).

sect the credibility and motivations of other people. This requires that there be some assurance that what is said in the jury room will not reach a larger audience. As Justice Cardozo stated in *Clark v. United States,* 289 U.S. 1, 13 (1922) : "Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." Similarly in *McDonald v. Pless,* 238 U.S. at 267–268, Justice Lamar stated :

"[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference."

Ordinarily, the means for ensuring the impartiality of the jury is through peremptory challenges at *voir dire. United States v. Duzac,* 622 F.2d at 913. In Wisconsin the impartiality of jurors is further ensured by the oath which all jurors must take that they will give "a true verdict . . . according to law and the evidence given in court . . ." Section 895.39 (1), Stats. 1981–1982. These means do not provide a foolproof mechanism for ensuring a jury completely free of bias or prejudice. However, to take further measures in an effort to perfect the jury could very well kill it. As Judge Learned Hand said in *Jorgensen v. York Ice Machinery Corp.,* 160 F.2d 432, 435 (2nd Cir.) *cert. denied,* 332 U.S. 764 (1947) :

"[I]t would be impracticable to impose the counsel of absolute perfection that no verdict shall stand, unless every juror has been entirely without bias, and has based his vote only upon evidence he has heard in court. It is doubtful whether more than one in a hundred verdicts would stand such a test; and although absolute justice may require as much, the impossibility of achieving it has induced judges to take a middle course, for they have recognized that the institution could not otherwise survive; they would become Penelopes, forever engaged in unravelling the webs they wove. Like much else in human affairs, its defects are so deeply enmeshed in the system that wholly to disentangle them would quite kill it."

Similarly, in *United States v. D'Angelo,* 598 F.2d 1002, 1005 (5th Cir. 1979), the Fifth Circuit Court of Appeals said:

"If courts were permitted to retry such verdicts, the result would be that every jury verdict would either become the court's verdict or would be permitted to stand only by the court's leave. This would destroy the effectiveness of the jury process which substantial justice demands and the constitution guarantees."

We conclude that the evidence of the juror's statement made during the jury's deliberations here is not competent under sec. 906.06(2), Stats.

Although we construe sec. 906.06(2), Stats., to prohibit juror testimony to impeach a verdict except testimony as to "extraneous prejudicial information" or "outside influence," we also recognize "that there might be instances in which . . . testimony of [a] juror could not be excluded without 'violating the plainest principles of justice.' " *McDonald v. Pless,* 238 U.S. at 268–269. In *Smith v. Brewer* discussed above at slip opinion page 799, the court, after concluding that Federal Rule of Evidence 606 (b) was intended to preclude evidence of juror prejudice in the jury room, went on to state that the Rule should not "be applied dogmatically and in complete disregard of

what is alleged to have occurred in the jury room." 444 F. Supp. at 490. The court stated that "[w]here . . . an offer of proof showed that there was a substantial likelihood that a criminal defendant was prejudiced by the influence of racial bias in the jury room, to ignore the evidence might very well offend fundamental fairness." 444 F.2d at 490.

In *Carson v. Polley*, 689 F.2d 562, 581–582 (5th Cir. 1982) the Fifth Circuit Court of Appeals interpreted Rule 606(b) as shielding from inquiry "[t]he subjective thoughts and emotions that may have influenced a juror's deliberations" but stated: "In an appropriate case, a letter from a juror to the court may reveal such a magnitude of prejudice as to move the court to grant a new trial rather than suffer an obvious default of justice." Similarly in *Wright v. United States*, 559 F. Supp. 1139 (E.D. N.Y. 1983) the United States District Court for the Eastern District of New York pointed out that there are "potential constitutional difficulties in applying Rule 606(b) to all allegations of racial prejudice" and concluded that "the better rule . . . is to analyze each such claim on a case-by-case basis." 559 F. Supp. at 1151.

We agree with the reasoning and the holdings of the *McDonald, Smith, Carson* and *Wright* cases *supra*. We conclude that the record here does not "reveal such a magnitude of prejudice" as to constitute "an obvious default of justice," or show such a "substantial likelihood" that the defendant was prejudiced by the influence of racial bias in the jury room as to "offend fundamental fairness" or "violat[e] the plainest principles of justice." The trial court after a hearing and the Court of Appeals both found that no such violation occurred here. We agree.

It is apparent that the racially referenced statement concerned only a very small part of the jury's delibera-

tion. The statement was made fifteen to twenty minutes before the end of a six hour deliberation. The juror who supplied the affidavit testified that she did not recall that any other references to race were made during the deliberation. We conclude that the evidence does not warrant a conclusion that the conviction must be reversed as a matter of fundamental fairness guaranteed by the due process clause.

■

The final question is what if any conclusion is to be drawn concerning the merits of a case from this court's denial of a request for certification. The court of appeals appears to have based its decision in this case partly on the fact that this court had earlier denied a request to hear the case on certification. *State v. Shillcutt*, 116 Wis. 2d at 233, n. 2. This is improper. A denial by this court of a request for certification carries no implication of approval or agreement. *State v. Nye*, 105 Wis. 2d 63, 65, 312 N.W.2d 826 (1981). A denial of a request for certification means nothing more than "unusual circumstances" are not present to require this court to review the case. *In Interest of J.S.R.*, 111 Wis. 2d 261, 263, 330 N.W.2d 217 (1983). Therefore, it is improper to infer from a denial of a request for certification anything insofar as the merits of a particular case are concerned.

*By the Court.*—The decision of the court of appeals is affirmed.

HEFFERNAN, C.J. (concurring). This case was taken by this court for review for two reasons: (1) To determine whether the language of the court of appeals decision in respect to the effect of this court's denial of a request for certification was erroneous, and (2) to decide whether, under the facts of this case, one juror could testify in respect to the effect upon her of a remark by another juror referring to the race of the defendant during the course of jury deliberations.

In respect to the first issue, it was apparent to this court that the court of appeals was erroneously interpreting the effect of a denial of a requested certification. Thus, this case was taken on review, in part, to set at rest an important question of appellate procedure. No member of this court disagrees with the majority's position in that respect. A denial of certification in no way delineates or suggests this court's position on the merits of a case.

In respect to the second issue, I agree with the majority opinion; but I write separately because I believe it appropriate to call attention to the record in this case and also to point out what I believe to be an emphasis by the dissenters upon a problem that, were proper trial techniques employed, need not have existed and could have been substantially avoided by proper *voir dire* procedures.

Under the state of this record, the trial court should be affirmed, because the testimony of the complaining juror was incompetent and barred by the rules of evidence designed to protect the right of trial by jury.

I would so hold because the alleged statement was not one of fact and, therefore, did not implicate the denial of the confrontational rights of the defendant. It is elementary law that the rule of this court, sec. 906.06(2), Stats., and its federal counterpart establish the general rule that "a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations . . . ." It particularly forbids the probing of any juror's mental processes. Here, on the face of the affidavit by the complaining juror, the appeal is to the "mental processes" of the jury. While what has been referred to as "logic" by the juror complained of as being prejudiced is clearly non-logic, it is apparent that it concerns a mental process—of a sort.

Yet, it is argued that there is an exception in the law that permits testimony in respect to the mental process of a juror if it involves "extraneous prejudicial informa-

tion" or if it is in respect to "outside influence . . . improperly brought to bear upon any juror." I believe that argument to be ill-founded. The two latter exceptions are to the prohibition against a juror testifying at all. They are not exceptions to the post-verdict blanket prohibition of any juror's testimony in respect to the mental processes of himself or another or the effect of a statement by another juror on the mental processes upon the juror wishing to testify.

One of the dissents purports to rely heavily upon *State v. Poh,* 116 Wis. 2d 510, 343 N.W.2d 108 (1984). However, *Poh* is a different case. *Poh,* authored by Justice Abrahamson, reversed because:

"The jurors were testifying about information some jurors had furnished the others. This information related to specific facts not of record concerning the defendant and the crime charged. The information which the jurors received was not the 'general knowledge' or 'the jury wisdom' we expect jurors to bring to their task. The jurors were not testifying about their thought processes or deliberations. It is clear that the jurors were testifying about extraneous information within the meaning of sec. 906.06(2)." At 521.

*Poh* involved truly extraneous material. *Poh,* because of the statement above, is supportive of the majority position in the present case. It is relevant to this case to the extent it points out a proper field of post-verdict impeachment inquiry—where "facts" are improperly brought to the attention of the jury and the defendant's constitutional confrontational rights are thereby violated.

In the instant case, no facts were put before the jury. The statement was one of jury "unwisdom," with which the system is occasionally saddled when lawyers fail to do their job. *Poh* is a different type of case from the one before us and so is *After Hour Welding, Inc. v. Laneil Management Co.,* 108 Wis. 2d 734, 324 N.W.2d 686 (1982);

but both demonstrate the injection of *facts* into jury deliberations—"extraneous information"—within the meaning of sec. 906.06(2), which may be inquired about as exceptions to the general rule forbidding impeachment of a verdict by a juror.

*After Hour* also implicated the confrontational rights, because specific facts were injected into the jury deliberations that had nothing to do with the mental processes or rationale to be employed by the jury. The statement allegedly made in *After Hour* was that the officer of the defendant corporations and his son had a part in causing the suicide of a Milwaukee judge and also that the officer's son defended "the outlaws." These were factual allegations dehors the record that tended to prove the specific defendants had committed "other crimes." In both *Poh* and *After Hour* the extraneous information concerned the specific conduct on other occasions of the very defendants before the court.

In the instant case, as has been pointed out, the statement was not one of fact. I am also concerned by the trial court's, the court of appeals', and this court's acceptance of the disgruntled juror's version of what happened, with only the most superficial "ferreting out" of the facts at the trial court level. To accept as competent, and as a verity, the statement of the disgruntled juror, without a more adequate investigation and hearing, leaves a record replete with ambiguity—one that is almost impossible to understand with certainty.

Although the trial judge commenced the postconviction hearing in respect to the attack on the jury verdict, reciting in some detail the requirements for a proper factfinding as mandated by *After Hour*, the hearing itself consisted only of an interrogation of the complaining juror. No other jurors were called. "Evidence" which ought to have been elicited by testimony appears in the record during the course of remarks by the court or by

counsel. No specific findings of fact were made by the court.

While more than one interpretation, accordingly, can be reached by a perusal of the record, the "facts" used in this concurring opinion are derived from the perusal of the record and are not contradicted therein.

In the present case, the disgruntled juror did not complain, according to the statement of the trial judge at the hearing, until, after the discharge of the jury, she was apparently "threatened" because she had voted to convict the defendant. Her affidavit attempts to exculpate herself from the onus of her own act as a juror, the conviction of the defendant. This is a classical case of a juror impeaching his or her own verdict in order to avoid possible censure for the verdict's consequences—the very vice that sec. 906.06(2), Stats., is designed to insure against. Moreover, she stated that she had wished to vote not guilty but voted to the contrary because of "duress." This, then, is the specific testimony of her mental processes in the jury room by which she arrived at her verdict. It is testimony of the effect of a "statement" or "anything" upon her mind or emotions. This is exactly what is forbidden by the rule of this court—a rule that has universal acceptance—in order to preserve the sanctity of the jury's deliberations.

Even if we accept the affidavit and the testimony of the juror at the hearing, the suspect information is not of extraneous prejudicial facts of the kind upon which emphasis was placed in *Poh*. It is a recitation of the statement of another juror and the recounting of the complaining juror's mental process.

I believe it is incorrect, however, to accept the juror's version as a verity, because her statement has not been appropriately tested. While this juror's motives, although self-serving and exculpatory, might have been honorable, any hold-out juror willing to claim that he or

she was subject to duress would, under the dissenters' view of this case, be able to secure reversal of a trial result and obtain a new trial for a defendant on the grounds of the juror's statement of the emotional pressure labelled as "duress." Whatever the effect of sec. 906.06 (2), Stats., a claim of this kind should not be acted upon unless the facts therein are verified by an accepted factfinding procedure.

Less than two years ago, in *After Hour,* we stated that a proper evidentiary hearing was the threshold step in allowing a juror to impeach a verdict. In the instant case, the record reveals that no juror other than the complaining one was called. The disgruntled juror, who sought to shed herself of blame for the verdict, was allowed to testify as to what another person on the jury said during the course of the deliberations. She was, however, not even sure of the name of the allegedly offending juror. And that offending juror, who has been named, although speculatively, by counsel in his briefs, was never given an opportunity to state his version or contradiction, if any he had, to the disgruntled juror's testimony. Only her self-serving testimony stands for the proposition that the statement was ever made. No other jurors were called. Only the complaining juror's statement tends to show that any other jurors were even within earshot.

I believe that the disgruntled juror's affidavit, revealing, as it did in my view, that any impeachment would have probed the forbidden area of a juror's mental processes, should not have triggered any hearing. However, once a hearing was undertaken, it should have been reasonably exhaustive and should have required the presence of other jurors.

The gratuitous remarks, evidentiary in nature, of counsel and of the court, are revealing in respect to what may be the real problem with this trial—an inadequate

*voir dire* of the jurors by the defense counsel. Defense counsel at the hearing stated:

"I sat up there during voir dire and I asked the jurors individually. I asked them as a group; 'Well, now, Mr. Shillcutt is black.' *I didn't even ask them if they were prejudice[d]*. I just stated would you be more likely to give benefit of the doubt to the state?" (Emphasis supplied.)

It would appear that, under these circumstances as described by counsel himself, only a most perfunctory effort was made to secure a fair, impartial jury at the time the jury was selected.

Thus, I am concerned that the dissenters would upset a verdict upon the basis of an inadequate record devoid of any corroboration. I am also concerned that the record reveals that defense counsel did not use the tools available to any lawyer to secure an impartial jury.

I believe that grandiloquent prose should be reserved in this case for the emphasizing of the necessity for counsel to utilize adequate *voir dire* procedures, rather than to inveigh against prejudice which need not have occurred had there been appropriate defense counsel vigilance. Emphasis should be upon techniques necessary to make the jury system—the great bastion of our liberties since the day of the Magna Carta—work, rather than to make new and unwarranted incursions into jury privacy.

Had counsel demonstrated greater care at the *voir dire* stage, this case could be in a far different posture, for it might well have been shown that a juror, under oath, had perjured himself. The *voir dire*, with its peremptory strikes and strikes for cause, is the prime instrument of the common law designed to assure an impartial jury and a fair trial.

Both *After Hour,* at 737, and *Poh,* at 515, stress the importance of the *voir dire* in securing an impartial jury.

It appears, however, that we are continuing to condone inadequate *voir dire* proceedings by nevertheless reviewing issues that could have been avoided by more searching jury selection procedures. In light of the statements of defense counsel at the post-conviction hearing, I would conclude that the error by which, arguably, a less than optimum jury was selected might have been that of counsel. If this verdict were to be vacated, I suggest that it be done only after an examination of the procedures used in securing a jury.

The impact of this case, at least as viewed from the perspective of the dissenters, is that the *voir dire* is a superfluous device—or it can become so—and even though counsel stumbles, he may have a second kick at the cat if the upshot is an arguably prejudiced jury. The result of counsel error might well be a reversal of a verdict, but it should not be on the basis of jury verdict impeachment asserted by the dissenters here.

The reasons for protecting jury deliberations from scrutiny have oft been repeated. It is well stated in the majority opinion. *Supra*, at 802–03. I believe that rights of minorities are best preserved by guarding the sanctity of jury deliberations and insuring that juries, as a part of our jurisprudential institution, will be as prejudice-free as possible. This can best be accomplished by utilizing the *voir dire* as it is intended to be used and by the proper superintendence of the proceedings by a vigilant trial judge. Those instances where the jury's deliberations have been compromised by "extraneous prejudicial information"—facts, as *Poh* makes clear— or where "outside influence" is improperly brought to bear are specifically made exceptions to the rule of non-disclosure, and in those circumstances a verdict may be impeached. There is no need to probe the mental processes of the jurors, as was attempted in the inquiry here. In any event, where a trial judge concludes that there is

an allegation of impropriety that would come within the exception to the rule, there must be a meaningful hearing—not, as in this case, only an inquisition of the complaining juror. A reversal could not, under the methodology of *After Hour*, be predicated on this record. If we are to be true to our judicial oaths, it is our duty to hold counsel's "feet to the fire" to make sure that the proper techniques provided by law are employed to assure equal justice under law and to avoid the likelihood that trial results will be skewed by prejudice. We ought not ignore our own rules and tested criminal trial procedures that are designed to protect the right to a fair trial by jury. We should not subvert our jury system and open up verdicts after the fact.

One dissenter has referred to this case as an "easy one." If so, it is strange that the trial court, the court of appeals, and this court disagree with the result urged in that dissent. The easy part of the case is the statement in the dissent with which no person attuned to Anglo-American values of justice could disagree, "Racial stereotypes have no place in judicial proceedings." (Abrahamson, J., dissenting opinion, at 829) I think that that dissenter would not argue, or even venture to assert, that the trial judge, the court of appeals, or the majority of this court believe to the contrary. What is easy is to stereotype this case as only presenting a problem of racial prejudice. To do so is to overlook the sanctity of the jury deliberations and the time-tested method of trying to assure prejudice-free verdicts. The case is an easy one, at least to label, if the problem of jury confidentiality is not addressed in the framework of Rule 906.06 (2).

I find it a difficult case because every instinct of a judge committed to the constitution is to lash out at any manifestation of prejudice and evil; but, in this case, to do that without giving heed to all the values involved is to cripple the jury system without going to the source

of the problem in the present case. The reasons for not allowing a juror to impeach his or her verdict have been repeated in numerous publications ad nauseum. I will not repeat them here. The majority opinion, the dissents, *After Hour,* and *Poh* are replete with supporting citations. I think it appropriate, however, to quote the words of Chief Justice Wollman of the South Dakota Supreme Court (concurring specially) when that court considered a somewhat similar problem. Referring to the difficulty of the question, he said:

"I say difficult, because . . . prejudice is so abhorrent to the judicial process there is a temptation to speak in magniloquent terms in expressing our condemnation of it and in fashioning remedies to counteract it." *State v. Finney,* 337 N.W.2d 167, 170 (S.D. 1983).

Although I believe a more adequate hearing should have been held as a predicate to any court's review of the question here presented, I conclude that the majority, instead of fulminating about the general problem of prejudice, properly points out that the jury system, correctly used, is our best assurance of the preservation of civil liberties and for the rendering of prejudice-free verdicts. I conclude that we should not expand the exceptions to the rule that would intrude into jury deliberations and in the end subvert, though unintentionally, the cause of justice.

I join in the majority opinion and concur for the reasons stated herein.

I am authorized to state that JUSTICE CALLOW joins in this concurrence.

STEINMETZ, J. (concurring). I agree with the result of the majority opinion; however, I believe the reasoning to be either faulty or confusing and I therefore concur.

The majority has misapplied the first phase of the test of *After Hour Welding v. Laneil Management Co.*, 108 Wis. 2d 734, 324 N.W.2d 686 (1982). The majority holds: "Thus, 'extraneous prejudicial information' is knowledge coming from the outside which is prejudicial. . . . The juror's statement here does not fall under the category of extraneous prejudicial information." (*Supra*, at 794.) In *After Hour* this court held:

"The concern for fairness to the parties and monitoring the integrity of the judicial system leads us to conclude that a trial court may, in appropriate circumstances, consider allegations that extraneous prejudicial remarks were made to jurors which were not a part of the judicially guarded evidence they received." 108 Wis. 2d at 739.

By that the court meant "extraneous" referred to outside of the court proceedings and evidence received therein even though it came during jury deliberations. It is not necessary that a source which is foreign to the jurors make the prejudicial remarks in order for it to be an outside influence. Section 906.06(2), Stats., distinguishes between "extraneous prejudicial information which was improperly brought to the jury's attention" and "any outside influence [that] was improperly brought to bear upon any juror."

If the majority is convinced this is not competent evidence under sec. 906.02(2), Stats., then there is no need to consider the other two phases of the *After Hour* test.

The extraneous prejudicial information in this case did not come to the jury "through the judicial sieve, where the fundamental guarantees of procedural law protect the rights of those accused of crime." *United States v. McKinney*, 429 F.2d 1019, 1023 (5th Cir. 1970), *cert. denied*, 401 U.S. 922 (1970).

The majority states: "We conclude that the evidence does not warrant a conclusion that the conviction must

be reversed as a matter of fundamental fairness guaranteed by the due process clause." (At 806.) That is a statement of principle stated in *After Hour* and *Poh* as forming a basis for the third phase test but it is not one of the phases. It may fit in either the second phase of whether the evidence shows substantial grounds sufficient to overturn the verdict or the third phase of whether the error would have prejudiced a hypothetical average jury.

Since the majority holds that it was not competent evidence, as it did at page 794 of the majority opinion, then it should not consider the second and third phases of *After Hour*. It is misleading for the majority to agree with the trial court and court of appeals analysis, which was not based on whether it was competent evidence.

The majority states that the trial court held "this information would [not] be prejudicial to a hypothetical jury . . ." (Majority op. at 792.) That is the third phase of *After Hour*, not the first or second phase of competency or substantial grounds to set aside the verdict as a matter of law.

The only protection for a fair trial in attempting to eliminate prejudices of individual jurors is to discover them during the voir dire phase of the proceedings and to strike them for cause or peremptory challenges. All jurors like all persons have some prejudices; however, when it is one of race, religion, gender or national origin, it must not be used as an influence on other jurors by keeping them from making decisions based on the evidence. If individual prejudice cannot be eliminated, at the least, the judicial system must prevent it from spreading as a cancer by influencing other jurors during the impartial decision-making process. As we stated in *Poh*, 116 Wis. 2d at 518–19: "We cannot 'expunge from jury deliberations the subjective opinions of jurors, their attitudinal expositions or their philoso-

phies. These involve the very human elements that constitute one of the strengths of our jury system.' " However, when such attitudes are expressed by a juror which have an influence outside of the evidence received, the trial court must consider such information. If this means looking at such information when it comes to the trial court's attention that a jury verdict may have been the result of any such form of prejudice *(After Hour),* then it is a duty not a burden of the judicial system to ferret out the truth, and this is done by applying one or all of the three phases of the *After Hour* test to arrive at the truth.

In this case, I believe the evidence of the juror's statement was competent under sec. 906.06(2), Stats. I do not believe the evidence shows by clear and satisfying proof that substantial grounds sufficient to set aside the verdict exist as a matter of law. The proof therefore fails under the second phase of the *After Hour* test. 108 Wis. 2d at 740.

This record does not show that the trial court held a sufficient hearing or made findings as to all of the seven requirements stated in *After Hour,* 108 Wis. 2d at 742, in reviewing the extraneous information. They are:

" '(1)  that the statement was in fact made;
" '(2)  specifically when it was made;
" '(3)  the circumstances under which it was made;
" '(4)  who made it;
" '(5)  which, if any, jurors were present;
" '(6)  whether jurors not present were informed of the statement; and
" '(7)  other relevant facts about the statement which will assist the trial court to assess the prospect of unfair prejudice.' "

Had those requirements been considered on the record by the trial court, the reviewing courts would be in a better position to analyze the extraneous information.

In the dissent of Justice Bablitch, he states: "[T]he jury could have become biased against the defendant

after hearing this information." (Dissent at 833.) I reject that as a test under either the second or third phase of the *After Hour* test. The test under the second phase of the *After Hour* test is whether by clear and satisfying proof the extraneous information demonstrated substantial grounds sufficient to set aside the verdict as a matter of law; the test under the third phase is whether there is a reasonable possibility or probability that the hypothetical average jury would have been prejudiced in the total context of the evidence which it was considering. *See, Poh,* majority and concurring opinions. I do not believe the other 11 jurors can be said to be so weak and uncommitted to their oaths to have been prejudiced against the defendant when considering the total evidence before them. The statement, if made, was one fraught with the individual's racial prejudice without any specific knowledge of the individual defendant's character as was the case in *After Hour.* To say that personal and isolated prejudiced remark could influence 11 other average jurors with the evidence before them as here is to weaken the jury system beyond giving it any conclusiveness.

The third phase of *After Hour* need not be considered. However, since there appears to be confusion in the majority opinion, I feel compelled to state that although the evidence shows an apparent prejudice of the juror, there was not a convincing showing there was a reasonable possibility or probability that prejudice would have resulted on a hypothetical average jury on the basis of the nature of the matter and the total context of the evidence before the jury. (*See, Poh,* majority and concurring opinions.)

Although I disagree with the reasoning of the majority, I concur in the result and would affirm the decision of the court of appeals.

SHIRLEY S. ABRAHAMSON, J. (dissenting). The jury in this case had been deliberating for nearly six

hours. The defendant was a black male charged with soliciting prostitutes and keeping a place of prostitution. The state's chief witness was a young white woman who testified that she gave the defendant her earnings from prostitution.

Finally one juror said to the others, "Let's be logical, he's a black, and he sees a seventeen year old white girl —I know the type." Another member of the jury expressed agreement with this statement. Twenty minutes later the jury reached a verdict of guilty.

This version of the incidents during the jury deliberations is taken from the sworn testimony of one of the jurors, the only witness at the hearing. After this juror testified, the circuit court stated that "the court would find—would believe [the juror] to be a credible witness, that the statement in fact did take place and she also indicates to the court that one of the female members of the jury did agree with that statement." Transcript of the Dec. 16, 1982 Hearing, pp. 15–16.[1]

---

[1] The only issue presented on this review as to the juror's post verdict testimony by either the state or defense or the court of appeals opinion relates to the racial statement. Two issues were presented at the circuit court—racial bias and coercion. After the juror testified at the post-verdict hearing, each issue was treated separately and distinctly by counsel and the circuit court.

After the circuit court ruled that the racial statement was not sufficient grounds to overturn the verdict, the circuit court asked counsel to discuss the second issue—coercion and duress. The juror had testified that she had voted for conviction because of duress and coercion by the other jurors. No argument was made before the court of appeals or this court by either the state or defense counsel that the conviction should be overturned on the ground of coercion or that the juror could testify as to this type of coercion.

In the judge's and prosecutor's discussion of the coercion issue, there is mention of an alleged threat made on the juror. Aside from the mention of a threat, this record reveals nothing about a threat. There is nothing in the juror's affidavit, or in her testimony in this case or in her testimony in the preliminary

The record does not show whether any blacks were on the jury, but in all probability this was an all-white jury. It is unlikely, although not unheard of, that a racially referenced remark would have been made in the presence of a black person. Furthermore, this case was tried in Winnebago county where only one third of one percent (approximately 380 out of 132,000) of the population is black. *Wisconsin Blue Book 1983–84*, p. 759 (1983). Even if one of those few blacks had been among the prospective jurors, the state could easily have stricken her or him from the jury. In Wisconsin there is a presumption that the state's peremptory challenge of minority persons does not violate a defendant's rights. *See State v. Grady*, 93 Wis. 2d 1, 10, 286 N.W.2d 609 (Ct. App. 1979).[2]

The majority rule announced today by Justices Day and Ceci and joined by Chief Justice Heffernan and Justice Callow, together with the *Grady* rule, hinders the judiciary's ability to ensure that racial prejudice does not enter into jury deliberations. I must therefore dissent.

---

examination in another case (part of which is in this record) about any threat.

There is no information anywhere in the record, the briefs, or oral argument to suggest that a threat or coercion was related in any manner to the juror's testimony as to the racial statement. To all appearances, nothing other than conscientiousness as a juror motivated her to come forward.

[2] *State v. Grady*, 93 Wis. 2d 1, 10, 286 N.W.2d 609 (Ct. App. 1979), was a Milwaukee county case in which the defendant was black and the state struck all three prospective black jurors. The court of appeals affirmed the conviction concluding:

"[There is a] presumption that the prosecutor was using his peremptory challenges to obtain a fair and impartial jury. . . . We do not find error merely because the prosecution struck all three blacks on the jury in this case. . . . Nor do we find error because the state's action resulted in defendant being tried by a jury which did not contain any members of his own race." *State v. Grady*, 93 Wis. 2d 1, 11, 286 N.W.2d 609 (Ct. App. 1979).

Every defendant in this state has a constitutional right to be tried by an impartial jury. Wis. Const. art. I, secs. 5, 7; U.S. Const. amends. VI, XIV. The right to an impartial jury is at the heart of due process.[3] Each juror swears to be impartial. Each juror takes an oath to render a verdict "according to the law and the evidence given in court." Sec. 895.39(1), Stats. 1981–82.

Twelve impartial jurors were to sit in judgment of this defendant. No juror is "permitted to summon that thirteenth juror, prejudice." *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 659 (1946) (Frank, J., dissenting).[4]

Nevertheless in this case, apparently one juror sought to convince at least two other jurors to vote for conviction by injecting a reference specifically relating the defendant's race to the facts of the case and the crime charged. Apparently the jurors were asked to assume that black men tend to use young white girls for immoral purposes and to reason from this assumption that if a young white prostitute accuses a black man of being a pimp, he probably is a pimp. Apparently at least one of the other jurors indicated some type of agreement with this stereotype.

---

[3] Wis. Const. art. I, sec. 8; U.S. Const. amend. XIV; *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Irvin v. Dowd*, 366 U.S. 717, 721–722 (1961); *Patterson v. Colorado*, 205 U.S. 454, 462 (1907); *State v. Poh*, 116 Wis. 2d 510, 519, 343 N.W.2d 108 (1983).

Where a juror's incapacity or unwillingness to decide a case solely on the basis of the evidence arises in connection with the defendant's race, religion, ethnic origin, or gender, the defendant's right to equal protection under the law may be implicated, as well as the right to an impartial jury and due process. Wis. Const. art. I, sec. 1; U.S. Const. amend. XIV.

[4] The jurors are free to leaven their deliberations with common-sense wisdom and experience and to deliberate fully and freely in secret, behind closed doors. But the jurors cannot bring racial stereotypes or racial prejudice to their deliberations or decision.

The gratuitous reference to the race of the defendant and the race of the victim can be taken as a deliberate attempt by a juror to employ racial stereotypes to bolster the state's case, which depended on the jury believing the state's witness rather than the defendant's testimony. The people of the State of Wisconsin do not need their criminal prosecutions bolstered by a jury resorting to racial stereotypes and prejudice. This court should not permit the State of Wisconsin to obtain convictions with this kind of "assistance."

Race discrimination is always odious. It is especially odious in the administration of justice. Race discrimination violates our federal and state constitutions, our statutes, and the fundamental ideals of our democratic society. When race discrimination occurs in a jury room, the harm is not only to the defendant but to the people of the state. Race discrimination in a jury room destroys the integrity of our judicial system. As Chief Justice Burger recently wrote for a unanimous Supreme Court in a child custody case, "The Constitution cannot control such [race] prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, —— U.S. ——, ——, 52 L.W. 4497, 4498 (1984).

Techniques such as voir dire[5] and instructions from the trial judge[6] help safeguard the impartiality of a jury

---

[5] In this case, as in *After Hour*, the voir dire was not reported. In argument to the circuit court at the post verdict hearing, defense counsel in this case briefly referred to his questioning of the jurors as to racial bias. But this reference does not tell us very much about the voir dire.

Defense counsel's only reference to the voir dire is as follows:

"I sat up there during voir dire and I asked the jurors individually. I asked them as a group; 'Well, now, Mr. Shillcutt is black.' I didn't even ask them if they were prejudice. I just

and ensure that persons who have racial biases that will interfere with their decision making do not sit on the

stated would you be more likely to give benefit of the doubt to the state? 'No, we wouldn't do that?' Would you be more likely to require Mr. Shillcutt to prove his innocence rather than the state prove its case? 'No, we wouldn't do that?' But, yet, despite those promises, despite the internal restraints we all have, a scene of racial prejudice reeked its ugly head and did so during jury deliberations."

As I read the record, defense counsel was trying to remind the circuit court that he did not merely ask the jurors whether they harbored racial prejudice. Defense counsel was not going to rely on a juror's subjective determination of prejudice. Defense counsel's questions as to racial prejudice were apparently designed to elicit answers which might provide an objective basis for counsel to evaluate a juror's impartiality. Defense counsel's questions were also designed to show the jurors ways in which they might unconsciously and improperly impose burdens on a black defendant.

While defense counsel has an obligation at voir dire to question the jurors as to racial bias to ensure an impartial jury and a fair trial, the prosecuting attorney has a similar duty. The prosecuting attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice be done." *Berger v. United States,* 295 U.S. 78, 88 (1935).

For a discussion of the difficulty of framing questions for voir dire to weed out potentially prejudiced jurors, see Van Dyke, *Voir Dire: How Should It Be Conducted to Ensure that our Juries Are Representative and Impartial,* 3 Hastings Const. L.Q. 65, 92 (1976); Levit, Nelson, Ball and Chernick, *Expediting Voir Dire: An Empirical Study,* 44 S. Cal. L. Rev. 916 (1971); Ginger, *Jury Selection in Civil and Criminal Trials* 535–41 (2d ed. 1984).

[6] The circuit court instructed the jury as follows: "The court has instructed you regarding the rules of law which should govern you in your deliberations. The time has now come when the great burden of reaching a just, fair and conscientious decision of this case is to be thrown wholly upon you, the jurors selected for this important duty. You will not be swayed by sympathy, prejudice, or passion. You will be very careful and deliberate in weighing the evidence. I charge you to keep your duty steadfastly in mind, and as upright citizens, to render a just and true verdict."

jury. But these techniques are not infallible. And whether or not they are used, when a claim is made after the verdict that a juror was racially biased and attempted to sway the jury using racial stereotypes, the circuit court must still decide whether the claim is valid and thus requires reversal of the verdict.

A "back-up" safeguard of fair trial—a "back-up" which should be used sparingly and with great caution—is post-verdict inquiry as to jury misconduct. Sec. 906.06(2) sets forth the ground rules under which a juror may testify in such an inquiry.

The issue in this case is whether the circuit court can consider the testimony of the juror who testified that racial bias entered the jury room. Invoking sec. 906.06 (2), Chief Justice Heffernan and Justices Day, Callow, and Ceci say that the juror's testimony cannot be considered because the juror was not competent to testify. Thus although a defendant in a criminal case has a constitutional right to a fair trial by an impartial jury, today's decision will hinder the defendant who tries to show in a post-verdict inquiry that racial bias entered into the proceedings.

Limitations on post-verdict inquiry into jury deliberations are necessary. Secrecy of jury deliberations protects the jurors' freedom to engage in frank and open discussions. Moreover there is a need for finality of verdicts lest judges "become Penelopes, forever engaged in unravelling the webs they wove." *Jorgensen v. York Ice Machinery Corp.*, 160 F.2d 432, 435 (2d Cir. 1947), *cert. den.* 332 U.S. 764 (1947).

Nevertheless, the defendant's right to a trial by an impartial jury must be protected. When reasonable grounds exist to indicate that the jury may have been exposed to extraneous or improper influences, "the entire picture should be explored," *Remmer v. United States,* 350 U.S. 377, 379 (1956). Frequently the only way to get "the picture" is by questioning jurors, since

the jurors are usually the only witnesses to the events in question. As Justice Steinmetz wrote for the court, "While the rule against impeachment of a jury verdict is strong and necessary, it is not written in stone nor is it a door incapable of being opened. It competes with the desire and duty of the judicial system to avoid injustice and to redress the grievances of private litigants." *After Hour Welding v. Laneil Management Co.*, 108 Wis. 2d 734, 737–38, 324 N.W.2d 686 (1982).

Sec. 906.06(2) seeks to reach an accommodation between the two policies—finality and secrecy on the one hand and fair trial on the other. Sec. 906.06(2) reaches this accommodation by allowing a juror to testify as to extraneous prejudicial matters improperly brought to the jury's attention or any outside influence improperly brought to bear upon any juror, while prohibiting testimony as to matters which inhere in the verdict. The language of sec. 906.06(2) is broad. In *State v. Poh,* 116 Wis. 2d 510, 518, 343 N.W.2d 108 (1983), this court recognized that it is difficult to distinguish between "inherent" matters and "extraneous" matters.

Four Justices, departing from *After Hour* and *Poh,* are persuaded that a juror's testimony as to racial comments during jury deliberations goes to the "effect" of something upon the minds of the jurors and that the juror is incompetent to testify to impeach the verdict. Justices Steinmetz and Bablitch and I, adhering to *After Hour* and *Poh,* are persuaded that consideration by the jury of racial stereotypes amounts to "outside influence" as to which the juror may testify.

Justices' parsing of the language of 906.06(2) to determine the juror's competency to testify masks the underlying determinative issue. As Judge Learned Hand warned, "the consecrated rubric" that jurors are incompetent to testify to impeach their verdict "offers an easy

escape from embarrassing choices." *Jorgensen v. York Ice Co. Machinery Corp.*, 160 F.2d 432, 435 (2d Cir. 1947), *cert. den.* 332 U.S. 764 (1947).[7] By relying on the rule that the juror cannot testify to impeach the verdict a court can avoid the responsibility of deciding whether in fact the defendant was given a fair and impartial trial. Judge Hand advised courts to avoid the rubric and to look at the facts, asking whether the "facts require the verdict to be set aside, as concededly some facts do." *Jorgensen, supra,* 160 F.2d at 435.

Chief Justice Burger, then Judge Burger, adopted Judge Hand's view, writing:

"The crux of the problem would be more clear if we regard the issue not as the admissibility of the juror's affidavit but rather its sufficiency for purposes of impeaching the verdict. We should not dispose of this case on the ground of admissibility. Rather we should view it as Judge Hand did and consider what the affidavit says, and assuming its truth for these purposes then decide whether it should lead to reversal." *Kilmes v. United States,* 263 F.2d 273, 274 (D.C. Cir. 1959).

After devoting seventeen of nineteen pages to the issue of the juror's competency to impeach the verdict, the majority opinion, joined by two other justices, ac-

---

[7] "The familiar rubric that a juror may not impeach his own verdict, dating from Lord Mansfield's time is a gross oversimplification." Federal Advisory Committee's Note to 906.06, 59 Wis. 2d R167. See also 8 Wigmore, *Evidence* sec. 2352, at p. 696 (McNaughton rev. ed. 1961). Commentators have noted that the rule that a juror cannot impeach the verdict is a rule of administrative convenience, difficult to justify on theoretical or conceptual grounds, and that there is a discernible trend towards broadening the exceptions to the rule that a juror cannot testify. See 8A Moore's *Federal Practice,* par. 31.08[1][a], p. 31–68 (9/78); III ABA Standards for Criminal Justice, Standards Relating to Trial by Jury, sec. 15–4.7, Commentary, p. 15–152 (2d ed. 1980); ALI, Model Code of Evidence, Rule 301; Comment, *Impeachment of Jury Verdicts,* 25 U. Chi. L. Rev. 360 (1958).

knowledges that the juror's competency to impeach the verdict is not the determinative issue. They recognize that the finality of the verdict and the secrecy of the jury deliberations must give way to the greater concern that the individual defendant be assured due process, a fair trial. Day, J., pp. 789, 790, 793, 794, 804, 805. I agree with the majority that sec. 906.06(2) must yield to due process requirements.

The majority finally concludes that the defendant was given a fundamentally fair trial and that the record does not "reveal such a magnitude of prejudice" as to require a reversal. Day, J., p. 805. I disagree that the proper test is "such a magnitude of prejudice." The usual test requires reversal when there is a reasonable possibility that the error complained of—here the injection of a racial stereotype in deliberations—might have contributed to the conviction. *State v. Poh, supra.* Applying the usual test in this case, I would have to conclude that the conviction must be reversed: there is a reasonable possibility that the injection of the racial stereotype contributed to the conviction and was not harmless error.

The post-verdict hearing in this case consisted of very limited questioning of one juror. This is not the type of "investigation" called for in *After Hour* to ferret out the truth as to racial prejudice in the jury room. I conclude that, at a minimum, *After Hour* and *Poh* require that this case be sent back to the circuit court to conduct a full hearing and take testimony from all the available jurors as to the incidents described by the juror who testified.

This court has eloquently and forcefully promised the citizens of this state that the Wisconsin judiciary would be vigilant in keeping racial, religious, ethnic, and gender stereotypes and prejudices out of the jury room. *After Hour* involved negative stereotyping on the basis

of religion; a juror referred to one of the participants in the trial as a "Cheap Jew." This court wrote:

"Whenever it comes to a trial court's attention that a jury verdict may have been the result of any form of prejudice based on race, religion, gender or national origin, judges should be especially sensitive to such allegations and conduct an investigation to 'ferret out the truth.' . . . For even if only one member of a jury harbors a material prejudice, the right to a trial by an impartial jury is impaired. . . . Trial courts should do all within their means to ensure that verdicts have not been compromised by jurors who harbor prejudice towards any minority.

". . . Our system of justice seeks the truth, whatever the jury finds the truth to be, but that truth cannot be determined when the jury is exposed to extraneous prejudices or information that the judge finds clearly and convincingly might have affected a hypothetical average jury. The voir dire is designed to eliminate prospective jurors who hold prejudices by striking such jurors from the panel. Having done that, prejudices should not be allowed to creep into the jury room by extraneous information that the jury determines would have affected an average hypothetical jury." 108 Wis. 2d at 739, 740, 744.

I am not willing to join the majority in relaxing our vigilance.

For me this case is not a hard case, it is an easy one. At a minimum, we ought to remand and insist that the trial court give this juror's assertion that a jury verdict may have been the result of racial prejudice a hard look. Racial stereotypes have no place in judicial proceedings. When the court lowers the guard to permit racial stereotypes to be "evidence" for the jury to consider during jury deliberations, it harms not only the individual defendant but the administration of justice.

On the basis of this record without further testimony there appears to be a substantial likelihood that the in-

troduction of the racial stereotype during the jury deliberations prevented the jury from deciding the case solely on the evidence presented and deprived the defendant of rights guaranteed by the state constitution: due process, equal protection of the law, and an impartial jury. Those rights are fundamental values in our judicial system. Impairment of those rights endangers the basic integrity and foundation of the judicial system.

"Equal justice under law" is not just a catchy phrase carved in stone on court buildings or recited on appropriate ceremonial or patriotic occasions. To "administer justice without respect to persons" is a promise the judges of this state have sworn to keep. See judge's oath of office, sec. 757.02(1), Stats. 1981–82. This case, like *After Hour,* presents an opportunity to keep that promise.

I cannot affirm the conviction on this record. I dissent.

WILLIAM A. BABLITCH, J. (dissenting). Our system of justice expects, and in fact must demand, that jurors put aside their prejudices during deliberations and judge a defendant's innocence or guilt solely on the evidence and the law as presented to them at trial. That clearly did not happen in this case. Accordingly, I would reverse and remand for a new trial.

This case involves a black man charged with soliciting prostitutes and keeping a place of prostitution. The state's chief witness against the defendant was a white female who testified that she met the defendant when she was seventeen years old. Approximately five hours and 40 minutes into the jury deliberations, a juror said: "Let's be logical; he's a black, and he sees a seventeen year old white girl—I know the type." Twenty minutes later, the jury returned with a guilty verdict.

The majority's decision upholding the denial of the defendant's motion for a new trial is based, in part, on its

interpretation of sec. 906.06(2), Stats. The majority concludes that the juror's statement that was made during the deliberations is not competent evidence under the statute because it is neither "extraneous prejudicial information," nor an "outside influence." *See* pp. 794, 795. I disagree.

Section 906.06(2), Stats., allows a juror to testify ". . . on the question whether *extraneous prejudicial information* was improperly brought to the jury's attention. . . ." (Emphasis supplied.) In interpreting this phrase this court has noted: ". . . a fundamental principle of our justice system is that the government has the burden of *establishing guilt* beyond a reasonable doubt *on the basis of evidence offered in the courtroom under the rules of evidence and under the supervision of the court." State v. Poh,* 116 Wis. 2d 510, 519, 343 N.W.2d 108 (1984). (Emphasis supplied.) This court has also stated that "sec. 906.06(2) ensures that *juries will reach verdicts on the basis of information known to the parties* and affords the party whose case is negatively affected by the information a chance to probe and rebut." 116 Wis. 2d at 520. (Emphasis supplied.)

By making the statement in this case, the juror was clearly trying to persuade his fellow jurors by bringing "facts" outside the record to their attention. In effect what this juror said was: "Let's be logical. Here's a black man charged with soliciting prostitutes and keeping a place of prostitution. I know the way these things work. You should know it too. The fact is that the way black pimps work is to get young white girls working for them and that's what happened here."

The juror's statement, in addition to evincing a personal prejudice, was of a type intended to persuade reluctant jurors that they should consider the "fact" that black pimps operate by utilizing young white women as prostitutes. This "fact" was not part of the evidence adduced at trial, and had it been offered, it could not have

been received. This was both extraneous and prejudicial information, which the defendant had no opportunity to rebut.

The majority's conclusion that the juror's statement is not competent evidence under sec. 906.06(2), Stats., is also contrary to this court's prior decision in *After Hour Welding v. Laneil Management Co.*, 108 Wis. 2d 734, 324 N.W.2d 686 (1982). In *After Hour*, during jury deliberations jurors made certain remarks, including the comment that an officer of the defendant corporation was "a cheap Jew." This court held that the jurors' remarks were competent within the meaning of sec. 906.06(2). *See* 108 Wis .2d at 739–40. I fail to see how this court could conclude that the remarks in *After Hour*, which were made in a civil case and which concerned non-parties to the suit, were competent evidence, yet conclude that the juror's statement in this criminal case, which concerned the defendant, is not competent within the meaning of the statute. If anything, this case presents a much more egregious case and therefore an easier case for concluding that the juror's statement is competent evidence. The reference in *After Hour* to the corporate officer's religion clearly evinced a subjective prejudice of the juror who made the remark. The juror's statement in this case, however, not only evinced a subjective prejudice but was also an attempt to bring a prejudicial "fact" outside the record to the other jurors' attention. The majority makes no attempt to distinguish *After Hour* and offers no explanation for the inconsistent holdings in *After Hour* and this case. Based on the language of sec. 906.06(2) and the holding in *After Hour*, I conclude that the juror's statement in this case is competent under sec. 906.06(2), and satisfies the first part of the test set forth in *After Hour*, and elaborated upon in *Poh*.

I also conclude that the second and third parts of the *After Hour-Poh* test were met in this case. The second

part of the test concerns whether the evidence shows substantial grounds sufficient to set aside a verdict, as a matter of law. *After Hour,* 108 Wis. 2d at 740. As this court stated in *Poh,* the second part of the test requires that the trial court ". . . determine whether it is convinced by clear and satisfactory evidence that the alleged extraneous information *reached the jury and could bias the jury against the moving party." Poh,* 116 Wis. 2d at 523. (Emphasis supplied.) The third part of the test requires a determination whether there is a reasonable possibility that the extraneous prejudicial information that was brought to the jury's attention might have contributed to the conviction. *Poh,* 116 Wis. 2d 525–32.

In this case, the trial court determined that the statement was made during the jury deliberations. Further, the statement had the effect of placing before the jury a "fact" not in the record which the defendant had no opportunity to rebut, and it related directly to the crimes with which the defendant was charged. I therefore conclude as a matter of law that the jury could have become biased against the defendant after hearing this information.[1]

Finally, in assessing the impact of the error that occurs when extraneous prejudicial information is brought to the jury's attention, this court has held that trial and appellate courts should consider ". . . such factors as the nature of the extraneous information and the circumstances under which it was brought to the jury's attention; the nature of the state's case; the defense presented at trial; and the connection between the extraneous in-

---

[1] The concurring opinion cites to this conclusion but rejects it ". . . as a test under either the second or third phase of the *After Hour* test." (Steinmetz, J., concurring op. at 818–819.) However, this is precisely the analysis that this court used in *Poh* to determine whether the second part of the test originally set forth in *After Hour* was satisfied. *See Poh,* 116 Wis. 2d at 523–24.

formation and a material issue in the case." *Poh,* 116 Wis. 2d at 530. Here, the statement had the effect of putting before the jury the "fact" that black men operate places of prostitution by using young white women as prostitutes. Because the defendant was charged with keeping a place of prostitution, it is logical to assume that the jury may have given more weight to the state's case in light of this extraneous prejudicial information. However, not only did this statement attempt to persuade other jurors by putting forth a new fact for consideration, but it was made more than 5½ hours into the jury deliberations, with the jury returning a guilty verdict approximately twenty minutes after the statement was made. I conclude that a reasonable possibility existed that this extraneous information might have contributed to the conviction. I would therefore reverse and remand for a new trial.

I would also reverse and remand because I conclude that the majority's holding denies the defendant his constitutional rights. As this court has acknowledged, extraneous information that arises during jury deliberations may impact upon three constitutional doctrines: a criminal defendant's right to trial by an impartial jury, the defendant's right to be present during the proceedings, and the defendant's right to be represented by an attorney. *Poh,* 116 Wis. 2d at 525–26. These rights are protected by both the United States and Wisconsin Constitutions. *Id.* These constitutional rights are implicated in this case. The majority's interpretation of sec. 906.06 (2), Stats., as applied to this defendant, effectively denies the defendant these constitutional rights. Rather than interpreting sec. 906.06 (2) in a manner that effectuates these rights, the majority elevates jury secrecy to the forefront of its consideration at the expense of the defendant's constitutional rights.

In *After Hour,* this court recognized the importance of a defendant's constitutional right to a trial by an impartial jury when it stated:

"Whenever it comes to a trial court's attention that a jury verdict may have been the result of any form of prejudice based on race, religion, gender or national origin, judges should be especially sensitive to such allegations and conduct an investigation to 'ferret out the truth'. *Morgan v. United States,* 399 F.2d 93, 97 (5th Cir. 1968), *cert. denied* 393 U.S. 1025 (1969). For even if only one member of a jury harbors a material prejudice, the right to a trial by an impartial jury is impaired. *United States v. Booker,* 480 F.2d 1310 (7th Cir. 1973)." *After Hour,* 108 Wis. 2d at 739–40.

This language of *After Hour* is in accord with two federal cases that discussed the question of racially prejudicial comments made by a juror. In *Tobias v. Smith,* 468 F. Supp. 1287, 1289 (W.D. N.Y. 1979), a juror stated that the issue of identification in the case was insignificant because " 'You can't tell one black from another. They all look alike.' " Another juror stated that the jury should believe the testimony of two white victims as opposed to the black defendant. The court allowed this juror testimony to be heard under Rule 606(b) of the Federal Rules of Evidence, the equivalent of sec. 906.06 (2), Stats., because the statements were "sufficient to raise a question as to whether the jury's verdict was discolored by improper influences and that they are not merely matters of jury deliberations." 468 F. Supp. at 1290.

The majority opinion attempts to distinguish *Tobias* from this case by stating: "The juror statement in *Tobias* is sufficiently different from the juror statement made here that the holding in *Tobias* is not useful precedent for this case." Slip op. at 800. I do not find this persuasive. I conclude that the statements in *Tobias* are

similar in nature to the juror's statement in this case, and the rationale set forth in that case is equally applicable to the issue presented in this case.

In *Wright v. United States,* 559 F. Supp. 1139 (E.D. N.Y. 1983), the court concluded that an evidentiary hearing into possible juror bias was not warranted because the possibly prejudicial comment involved was an isolated racial epithet spoken outside of jury deliberations. However, the court stated: "Certainly, if a criminal defendant could show that the jury was racially prejudiced, such evidence could not be ignored without trampling the sixth amendment's guarantee of a fair trial and an impartial jury." 559 F. Supp. at 1151. The court also stated: " '[t]here may be instances in which such testimony of the juror could not be excluded without violating the plainest principles of justice.' " *Id.,* quoting *McDonald v. Pless,* 238 U.S. 264, 268–69 (1915). This is precisely the effect that the majority's conclusion has in this case. Here, the juror uttered a statement during jury deliberations that reflects a prejudiced mind incapable of giving the defendant a fair trial. Furthermore, the juror attempted to persuade other jurors with this extraneous information. This clearly impacted on the defendant's right to be tried by an impartial jury, his right to be present during the proceedings and rebut this information, and his right to be represented by an attorney.

The majority opinion recognizes the defendant's constitutional right to be tried by an impartial jury, and defines that right as encompassing two separate rights: the right to be tried by a jury, and the right to be tried by a jury that is impartial. *See* p. 802. The majority's focus on the need for secrecy of jury deliberations reflects its concern with the need to protect the right to be tried by a jury. What the majority opinion fails to recognize, however, is that the right to be tried by a jury is rendered meaningless if the jury is not impartial.

In the abstract, the goal of preserving the right to a trial by jury is laudatory; however, the protection of that right is of small consolation to a defendant in a particular case if the jury by which he or she has been tried was not impartial.

I dissent. I would reverse and remand for a new trial.