MILLER, Appellant, v. ILLINOIS CENTRAL RAILROAD, Respondent.

*September 7—October 3, 1967.*

For the appellant there was a brief by *Eisenberg & Kletzke,* attorneys, and *Jerome F. Pogodzinski* of counsel, all of Milwaukee, and oral argument by *Sydney M. Eisenberg.*

For the respondent there was a brief by *Petersen, Sutherland, Axley & Brynelson,* and oral argument by *James C. Herrick,* all of Madison.

HALLOWS, J. This appeal presents three questions: (1) Whether the trial court should have found as a matter of law the railroad was causally negligent in not maintaining a proper warning sign on the west side of the crossing; (2) whether the findings of the jury in respect to negligence and damages are supported by the evidence and were the result of perversity; and (3) whether a new trial should be granted in the interest of justice because of misconduct of the jurors.

The facts concerning the accident are in dispute. According to Miller's version, on March 5, 1964, he was driving east on County Highway PD (McKee Road) in the town of Fitchburg, Dane county, Wisconsin. He was on his way to Madison and was unfamiliar with the road, which was wet and slushy with patches of snow. Prior to the collision which occurred about 1 o'clock in the afternoon he saw a sign on a hill about 500 feet west of the place where the railroad crossed the highway but the sign was covered with snow and he thought it was a curve sign. He proceeded at 35 to 40 miles per hour over a hill and when he was about 35 to 40 feet from the track he heard a noise to his right, was aware the train was coming, put on his brakes, skidded some 12 feet and came to a stop on the highway with the front of his car slightly across the railroad track. He did not hear a warning whistle from the train until after he was struck. He did not see any wigwag warning device at the east side of the crossing and there was no sign or signal on the west side. At the point where the railroad track crossed the road the view from the highway to the south of any oncoming train is obscured by hills on both sides of the track.

According to the railroad's version of the accident, the railroad sign west of the crossing was free of snow and as Miller approached the track from the west, two of their witnesses were approaching from the east. Ac-

cording to one of these, Officer Booth, he first saw Miller approach the crossing when their respective cars were about 200 to 300 feet from the track. Booth heard the train's whistle and bell, saw the wigwag crossing warning device on the east side of the crossing working and heard its audible signal. The same warnings were heard and seen by the other witness who was driving a tractor on the road in back of Booth's car. Booth stopped his car on the east side of the crossing and the train passed in front of him. After the train cleared the crossing, Booth noticed Miller's car was no longer on the road but was in the ditch on the west side of the crossing in a severely damaged condition. Booth did not see the train strike Miller's car. The engineer testified he saw Miller when Miller was 200 to 300 feet west of the crossing and Miller did not slow his speed and struck the side of the engine.

## I. *Lack of a railroad warning signal.*

The trial court found the railroad was negligent in not providing the proper warning signal as required by sec. 192.29 (5), Stats.,[1] and submitted the causation question to the jury which found the negligence not causal. Miller contends the failure to maintain this sign as a matter of law was causal and the only cause of the accident. He argues he was traveling only 35 to 40 miles per hour on a road the speed limit on which was 65 miles per hour, that the road was wet, slushy, and partly covered with snow which obscured the track, that his view of a train coming from his right was obstructed by the physical condition of the land and because the train gave no

[1] "(5) DANGER SIGNS. Wherever its track crosses a public highway or street, every railroad corporation shall maintain on each side of the track and near such crossing a large signboard with the following inscription, painted in large letters: 'Railroad Crossing,' in such manner as to be visible to approaching traffic on the highway or street at least 100 feet distant."

audible signal he was not aware of its presence on the track until he was 35 to 40 feet from the track. He concludes his awareness of railroad tracks and of a possible train would have occurred much sooner and in time to avoid the accident if the railroad had a proper sign on the west side of the track. Miller also argues he was entitled to drive up even with the wigwag signal and if a sign had been properly placed on the west side of the crossing he would have stopped west of the track rather than on it.

If Miller's version were the only credible view of the evidence or if the jury had accepted his version, he no doubt could claim the benefits of *Shaver v. Davis* (1922), 175 Wis. 592, 185 N. W. 227, and *McLaughlin v. Chicago, M., St. P. & P. R. R.* (1966), 31 Wis. 2d 378, 143 N. W. 2d 32, in both of which the juries found the railroad negligent. These cases are not controlling on the question of whether the railroad was negligent as a matter of law. Miller's version of the accident was not the only reasonable one and the evidence presented a proper jury question of whether a proper railroad sign on the west side of the track would have under the circumstances favorably affected Miller's lookout or speed. The trial court did not commit error in not deciding the question as a matter of law.

II.  *Validity of the negligence and damage findings.*

On appeal the universal rule is that we accept the version of the evidence which is most favorable to the verdict and if the credible evidence is sufficient to support it although not necessarily the great weight, the verdict must stand. Miller first argues the failure to maintain a crossing sign on the west side of the track was causal and the jury completely disregarded the evidence in not so finding. In developing this argument, however, Miller argues this crossing was particularly dangerous and he should have had the benefit of an in-

struction to the effect the railroad is under a greater duty to guard such crossings than ordinary ones. But the failure to ask for such an instruction or the court to give one *sua sponte* does not point to any perversity of the jury. Whether such an instruction would be proper is a question not raised on this record. The record discloses, however, sufficient credible evidence for a jury to find that the lookout and speed of the plaintiff were such that the absence of a sign as required by sec. 192.29 (5), Stats., on the west side of the crossing was not a factor in the collision.

The evidence in respect to whether there was an audible signal in the form of a whistle or horn given by the train is in conflict. The two witnesses, who were driving on the highway and approaching the crossing, heard the whistle of the train and one also heard the automatic bell ringing on the wigwag signal at the crossing. The engineer testified the bell started to ring and the whistle to sound when the engine was about 1,200 to 1,400 feet from the crossing. The fact the plaintiff and two witnesses who were in homes near the crossing did not hear a train whistle is not determinative. The jury had the right to believe the testimony of the engineer and the two drivers on the road. Their testimony was not inherently unworthy of belief.

The jury found Miller causally negligent as to lookout, but he argues it was impossible to see the train until he was 35 to 40 feet from the track. As we read the record, Miller did not testify he could not see the train sooner but merely that he did not see the train until he was about 35 to 40 feet from the crossing. There was testimony that from a distance 200 feet west of the crossing one could see 78 feet south on the track and from 100 feet west of the crossing one could see 117 feet south on the track. Miller testified he could not see the railroad sign on the east side of the crossing because it blended in with the line of telephone poles. While the jury could have believed this in respect to the crossbuck

part of the sign, the plaintiff did not see the wigwag signal and the flashing light or hear the bell ringing; he also failed to see the two oncoming vehicles on the road east of the track. On this evidence the jury could find the plaintiff did not maintain a proper lookout and it was causal.

In finding Miller causally negligent as to speed, the jury undoubtedly did not believe his testimony that he was going between 35 and 40 miles per hour. Even at that speed he could not stop in 35 to 40 feet as he testified. There was testimony by the engineer which the jury could believe that Miller was going 50 to 55 miles per hour when he was about 200 feet west of the crossing and his car did not slow up as it approached the train and ran into the side of the engine. We think the jury was not obligated to disregard the engineer's testimony as being incredible and the weight to be given it because of the circumstances of the observation at an acute angle was for it to determine. The jury had a right to reject Miller's testimony so long as what it found was supported by sufficient credible evidence. *Webb v. Wisconsin Southern Gas Co.* (1965), 27 Wis. 2d 343, 134 N. W. 2d 407.

Miller claims the amount of damages is so inadequate as to reflect perversity. There is no doubt that Miller was seriously hurt, had several operations, suffered a permanent injury, and lost some earning capacity. The jury found $15,000 for the personal injury, pain and suffering, $4,000 for loss of earnings, and $10,000 for future loss of earnings. The court determined the medical expenses at $11,765 and later approved the jury's determination of damages. Because by its answers to the negligence questions, the jury determined there was no liability on the part of the railroad and these answers are supported by sufficient credible evidence, the granting of inadequate damages does not necessarily show prejudice or render the verdict perverse. *Sell v. Milwaukee Automobile Ins. Co.* (1962), 17 Wis. 2d 510, 117

N. W. 2d 719; *Wojkiewicz v. American Family Mut. Ins. Co.* (1967), 33 Wis. 2d 351, 147 N. W. 2d 249. Of course, prejudice could exist in fact as to damages but this becomes immaterial and moot if no liability exists excepting in a case where such negligence issues were decided on the minimum of credible evidence which was against the great weight of the evidence. In such a case a new trial could be granted in the interest of justice, but such a case is not presented upon this record.

### *Misconduct on the part of the jury.*

Miller asks for a new trial in the interest of justice because of misconduct on the part of the jury in several respects. He claims: (1) One juror, Emil Luchsinger, viewed the scene of the accident to make observations of the town road and the railroad crossing; (2) Luchsinger sought an opinion of a nonjuror relating to the accident; (3) some of the jurors discussed the case during trial and before all the evidence was in; and lastly, other jurors did not fully understand the instructions. Miller supports his contentions by an affidavit of Luchsinger and by his own based upon his conversations with five jurors after the jury was discharged.

This court has from ancient times held to the general rule that a jury verdict may not be attacked or impeached by affidavits or testimony of a juror. But, as was pointed out in *Peppercorn v. Black River Falls* (1894), 89 Wis. 38, 61 N. W. 79, this rule applied only to the deliberations of the jury after the case was submitted to it. Exceptions to the rule were noted in *McBean v. State* (1892), 83 Wis. 206, 53 N. W. 497, but the rule was founded upon the need for secrecy of the jury deliberations and the impropriety of disclosing the mental processes of the jury in arriving at a verdict. In *Hempton v. State* (1901), 111 Wis. 127, 86 N. W. 596, the scope of the rule was stated to include misconduct in the courtroom, but the jury's misconduct outside

the courtroom could be established by a juror's affidavit or testimony for the impeachment of the verdict. The proof of the attack on the verdict for misconduct occurring outside the courtroom did not seem to depend upon who initiated the attack or whether such knowledge was derived prior to the jury's discharge.

In *Ford Motor Credit Co. v. Amodt* (1966), 29 Wis. 2d 441, 139 N. W. 2d 6, we abolished an exception to the ancient rule, which exception permitted a jury to impeach its verdict by affidavit in a situation where the verdict was erroneously recorded. This exception was recognized in *Wolfgram v. Schoepke* (1904), 123 Wis. 19, 100 N. W. 1054, and was based on the theory that an erroneously recorded verdict was not in fact the verdict of the jury and public policy would not permit such a verdict to stand lest the faith and confidence in the jury system would be jeopardized. However, *Ford* held the competing public policy of not allowing a juror to impeach a verdict and of discouraging the losing party from harassing jurors required the abolition of the exception. In *Ford* we recognized there were existing cases outside of the old rule in which jury verdicts might be impeached through the initiation of a third person, such as a clerk of the court or a bailiff, in which jurors' affidavits or testimony was necessary. To give greater dignity and finality to jury verdicts, we, in effect, restricted these types of cases by extending or enlarging the old rule so as to include any impeachment of a verdict based upon misconduct of a juror occurring at any time whether in the courtroom, outside the courtroom or during deliberations, excepting a juror's affidavit or testimony could be used only in cases in which the court is convinced:

". . . (1) that substantial personal awareness of the alleged impropriety is within the direct and independent knowledge of one who did not serve as a member of the jury, (2) that such knowledge was not derived by such person from a juror after the jury's discharge, and (3)

that the challenge to the integrity of the verdict originated from such person rather than from a juror. Thus, jurors may sometimes be required to confirm or deny someone else's attack upon their verdict, but they themselves may never embark on a course which will impeach their verdict." Pages 450 and 451.

The two affidavits presented setting forth misconduct outside the courtroom on the part of various jurors do not meet these conditions. Luchsinger's affidavit is made by a juror and Miller's affidavit contains matters based on knowledge derived from jurors after the jury's discharge. Consequently, we do not reach the merits of the claims of misconduct.

Miller argues that *Peppercorn v. Black River Falls, supra,* was not expressly overruled and is still the law. This case involved an unauthorized view by a juror. But, it is not the type of misconduct or the place of misconduct which is now controlling under *Ford* but whether the testimony or affidavit of a juror is competent and admissible. *Peppercorn,* allowing the use of a juror's affidavit on the ground the misconduct occurred outside the courtroom, is no longer law.

It might have been unfortunate and misleading that we did not clearly point out in *Ford* the significant enlargement of the rule, but when a broad principle of law is laid down by this court, it is normally impossible for it to cite and discuss every decision which is affected thereby or is no longer law in some respects. The specific holding or the deliberate language of the latest case on the subject is sufficient to overrule *sub silentio* inconsistent holdings or language of prior cases.

*By the Court.*—Judgment affirmed.