STATE of Wisconsin, Plaintiff-Respondent,

v.

William M. MESSELT, Defendant-Appellant-Petitioner.

Supreme Court

*No. 91–2060–CR. Oral argument March 31, 1994.—Decided June 23, 1994.*

(Also reported in 518 N.W.2d 232.)

For the defendant-appellant-petitioner there were briefs and oral argument by *Richard D. Martin,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

Amicus curiae brief was filed by *Mark S. Young* and *Habush, Habush, Davis & Rottier, S.C.,* Milwaukee for the Wisconsin Academy of Trial Lawyers.

JON P. WILCOX, J. This is a review of a published decision of the court of appeals, *State v. Messelt,* 178 Wis. 2d 320, 504 N.W.2d 362 (Ct. App. 1993). The defendant, William Messelt (Messelt) argues that he is entitled to a new trial because extraneous, prejudicial information reached one or more jurors prior to the verdict. The court of appeals affirmed the trial court's dismissal of Messelt's postconviction motion based largely upon its belief that sec. 906.06(2), Stats.,[1] pre-

[1] Section 906.06(2), Stats., provides that:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon

vents jurors from testifying as to whether extraneous prejudicial information reached the jury unless the information in question was communicated to all twelve jurors. While we believe the court of appeals misinterpreted sec. 906.06(2), we nevertheless hold that under the facts of this case, Messelt is not entitled to a new trial.

In April of 1989, Messelt was charged in connection with the 1988 assault of an elderly Jackson County woman. Messelt's arrest triggered a series of articles in the local newspapers. In addition to identifying Messelt as the suspect and describing the evidence which allegedly linked him to the crime, a number of articles also revealed that Messelt had twice before been convicted of sexual assault.

Prior to trial, Messelt moved for a change of venue, or in the alternative, that the jury be selected from outside of Jackson County. Messelt argued that such measures were necessary given the substantial pretrial publicity his case had received. The Honorable Robert W. Radcliffe, circuit court judge for Jackson County, denied Messelt's motions.

Predictably, the extent to which potential jurors had been exposed to pre-trial publicity was a primary focus of voir dire. In response to questions by the trial court, a number of individuals acknowledged having some information about the case. Several panel mem-

the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may the juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received.

bers were struck for cause. The rest were individually questioned by defense counsel and/or the court. All those eventually selected to serve as jurors stated under oath that they had not formed an opinion as to Messelt's guilt or innocence, and that they would base their decision solely upon the evidence presented at trial. None of the jurors indicated that they had any knowledge of Messelt's prior criminal record.

On July 25, 1990, Messelt was convicted of two counts of second-degree sexual assault, one count of burglary while concealing identity, and one count of false imprisonment while concealing identity. He was sentenced to 52 years in prison. Evidence of Messelt's other crimes was not admitted during the trial.

Following his conviction, Messelt brought a motion for relief, including a new trial, pursuant to sec. (Rule) 809.30, Stats. Messelt argued that a new trial was necessary because "extraneous, inadmissible prejudicial information" about him reached one or more jurors before the verdict.

A hearing on Messelt's post-conviction motion was conducted on July 26, 1991. All of the jurors, including the two alternates, testified at this hearing. The testimony of several of these jurors stands at the center of the present controversy.

Juror Relyea testified that ten or twelve years before this trial began she had heard "gossip" that Messelt raped a young girl, but she did not know whether he had been convicted of that assault. Relyea did not share this information with the other jurors. When asked why she failed to reveal this knowledge during voir dire, Relyea responded that "Nobody asked me that." Relyea also recalled a conversation she had with juror Young immediately following deliberations in

which Young indicated that he knew that Messelt had a "prior."

During his testimony, Young insisted that he did not learn of Messelt's prior convictions until after the trial. Reiterating the responses he gave during voir dire, Young testified that the only information he had pertaining to Messelt's previous troubles related to some disciplinary problems Messelt experienced while in middle and high school.

Juror Walsted testified he learned of Messelt's prior convictions through a newspaper article he had read well in advance of the trial. Upon further questioning, though, Walsted backed away from that statement, explaining that he "never really read the article as far as reading it," and that he could not recall what Messelt's prior convictions were for. Like Relyea, Walsted indicated that he did not discuss this information with any of the other jurors.

In contrast to Walsted, the testimony of alternate juror Szymanski was unequivocal. Szymanski revealed that during the course of the trial, a person with whom he worked told him of Messelt's prior convictions. Szymanski did not communicate this information to the other jurors, nor as an alternate did he participate in the jury's deliberations.

In addition, at least four jurors testified that during deliberations, one juror theorized that the police may have suspected Messelt because he had been in "trouble" before. The person recalling this statement best was juror Gebhardt. Gebhardt, who also served as jury foreperson, testified that the rest of the jurors considered the remark to be "just speculation" and agreed that it should not effect their deliberations. Gebhardt emphasized that the remark was not

presented as a factual assertion, nor did it include any reference to Messelt's prior crimes.[2]

One final incident came to light at the postconviction hearing. On a Friday evening during the trial, Walsted and his father visited the home of a Mrs. Hanson. During that visit, the elder Walsted and Mrs. Hanson discussed the Messelt trial. Walsted testified that although he was present during this conversation, he did not participate, nor did he hear what was discussed.

Walsted's testimony was somewhat at odds with a statement Mrs. Hanson provided to Messelt's investigators.[3] In this statement, Mrs. Hanson indicated that she and Walsted's father probably discussed Messelt's prior convictions during that Friday evening conversation. She also stated that Walsted's father suggested that Messelt be "castrated." Although she confirmed that Walsted did not participate in the conversation, Mrs. Hanson thought Walsted "probably" heard what was discussed.

Based on this testimony, the trial court drew the following conclusions. First, the court held that Gebhardt's testimony simply provided evidence of one juror's subjective mental processes, i.e., his or her speculation that Messelt may have been in trouble before. The court believed that such testimony was incompetent under sec. 906.06(2), Stats.

---

[2] The testimony of those jurors with respect to the remark made during deliberations that Messelt might have been in "trouble" before is hereinafter referred to collectively as "Gebhardt's testimony."

[3] Mrs. Hanson testified briefly at the postconviction hearing, but for personal reasons unrelated to this case she was unable to continue. As a result, the trial court took under consideration the statement she had provided earlier.

With respect to Szymanski, the trial court found that he did not share his knowledge of Messelt's prior convictions with any other juror. That, in addition to the fact that he did not participate in the jury's deliberations, led the trial court to conclude that the information Szymanski possessed could not have prejudiced Messelt.

As to Relyea, the court found that she knew about one of Messelt's prior assaults before the trial began. The court concluded, however, that Relyea regarded this information as unsubstantiated "gossip." As such, he did not believe the information prevented Relyea from being an impartial juror.

The court also found credible Young's testimony that he did not learn of Messelt's other crimes until after the trial was over, and that all Young knew about Messelt's earlier troubles related to school disciplinary problems. The court held that such knowledge could not reasonably have contributed to Messelt's conviction.

Finally, the court found it difficult to believe that Walsted had not heard any of the conversation that took place between his father and Mrs. Hanson. Nevertheless, the court concluded that in light of Walsted's denials and Mrs. Hanson's poor memory, it could never be known with certainty what was discussed that evening. The court also made note of the fact that Walsted did not share any extraneous information with the other jurors. As a result, the court held that any such information Walsted might have possessed could not in and of itself be the basis for a new trial.

The court of appeals affirmed. Relying upon the trial court's finding that Relyea, Walsted, Young and Szymanski did not communicate the extraneous information in their possession, the court of appeals held

that sec. 906.06(2), Stats., rendered all their testimony incompetent. The court based this conclusion on its belief that sec. 906.06(2) prevents jurors from testifying on the question of whether extraneous prejudicial information was improperly brought to their attention unless that information was communicated to all twelve jurors.

Finally, the court of appeals held that the trial court's failure to make a clear finding as to what information Walsted may have overheard in Mrs. Hanson's kitchen prevented Messelt from relying upon the events of that evening to impeach the jury's verdict.

The court of appeals did not address either the competency or the prejudicial effect of Gebhardt's testimony.

It is not necessary for this court to indulge in a lengthy tribute to the American jury system. Commentators of far greater eloquence have already dedicated themselves to that task. Let it suffice to observe that the criminal defendant's right to be tried by an impartial jury of his or her fellow citizens is the cornerstone of our system of justice. That right is enshrined in our state and federal constitutions.[4]

Along with the right to an impartial jury, our system also places upon the state the burden of proving the criminal defendant's guilt beyond a reasonable doubt based solely upon evidence offered in the courtroom under the rules of evidence. *Turner v. Louisiana,* 379 U.S. 466, 472–73 (1965). As we noted in *State v. Poh,* 116 Wis. 2d 510, 519–20, 343 N.W.2d 108 (1984), these requirements help ensure that juries will reach verdicts based on information known to the parties,

---

[4] U.S. Const. amend. VI; Wis. Const. Art. I, sec. 7.

and that parties have the opportunity to confront and rebut the evidence used against them.

Still, the law has long recognized that it is impossible to empanel a jury completely immune from prejudice and totally insulated from non-evidentiary information. As Judge Learned Hand observed nearly fifty years ago:

> [I]t would be impracticable to impose the counsel of absolute perfection that no verdict shall stand, unless every juror has been entirely without bias, and has based his vote only upon evidence he has heard in court. It is doubtful whether more than one in a hundred verdicts would stand such a test . . ..

*Jorgensen v. York Ice Machinery Corp.,* 160 F.2d 432, 435 (2nd Cir. 1947), cert. denied, 332 U.S. 764 (1947).

In fact, we expect jurors to bring their experiences, philosophies, and common sense to bear in their deliberations. These human characteristics comprise one of the great strengths of our jury system. *Poh,* 116 Wis. 2d at 518–19, quoting *United States v. McKinney,* 429 F.2d 1019, 1022–23 (5th Cir. 1970).

Courts have struggled to accommodate this inherent conflict between the desire to obtain perfectly just results in each case and the need to preserve the finality of judgments. *Poh,* 116 Wis. 2d at 517. The common law resolved this conflict by establishing a virtually inviolable rule against the impeachment of verdicts. This was best reflected in the oft-repeated rubric that a "juror cannot impeach his own verdict."[5] This rule, which in practically every instance prohibited jurors from testifying about their deliberations, grew to near universal acceptance in England and America. In

---

[5] This rule is generally traced to the case of *Vaise v. Delaval,* 99 Eng. Rep. 944 (K.B. 1785).

*McDonald v. Pless,* 238 U.S. 264, 267–68 (1915), the Supreme Court articulated the policies upon which the common law rule was based:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation — to the destruction of all frankness and freedom of discussion and conference.

Evident in this pronouncement is the concern that allowing jurors to testify about their deliberations would destroy the finality of judgments, subject jurors to harassment and intrigue, and discourage frank and honest deliberations.

With but a few exceptions,[6] Wisconsin clung to the common law's strict prohibition against a juror giving evidence that might impeach a verdict. For example, in *Kink v. Combs,* 28 Wis. 2d 65, 78, 135 N.W.2d 789 (1965) this court prevented a juror from testifying that she assented to a verdict only because of fatigue. And in *Boller v. Cofrances,* 42 Wis. 2d 170, 177, 166 N.W.2d

---

[6] *See, e.g., Brophy v. Milwaukee Electric Railway & Transport Co.,* 251 Wis. 558, 566, 30 N.W.2d 76 (1947) (allowing jurors to testify that the verdict reported was not that which the jurors actually agreed upon.)

129 (1969), we held inadmissible a juror's affidavit which indicated that the jury gave weight to a question asked at trial despite the court's instructions to disregard.[7]

In 1973, Wisconsin adopted sec. 906.06, Stats.[8] Subsection (2) of that statute, which is virtually identical to Rule 606(b) of the Federal Rules of Evidence, provides the following:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may the juror's affidavit or evidence of any statement by the juror concerning a

---

[7] *See also, Miller v. Illinois Central Railroad,* 36 Wis. 2d 184, 152 N.W.2d 898 (1967), wherein this court held that a juror's knowledge about alleged juror misconduct was admissible only when 1) the knowledge was within the direct and independent knowledge of a non-juror, 2) that such knowledge was not acquired from a juror after the jury's discharge, and 3) that the challenge to the verdict originated from a non-juror. *Id.* at 193. Thus, we concluded, "jurors may sometimes be required to confirm or deny someone else's attack upon their verdict, but they themselves may never embark on a course which will impeach their verdict." *Id.* at 194.

[8] Supreme Court order dated June 5, 1973, effective January 1, 1974.

matter about which the juror would be precluded from testifying be received.

The court of appeals believed that this statute rendered incompetent the testimony offered by the jurors at the postconviction hearing. We believe that court's analysis was flawed in several important respects.

First, it is well established that sec. 906.06(2), Stats., and its federal counterpart, Rule 606(b), do not prevent jurors from testifying for purposes of determining whether a juror failed to reveal potentially prejudicial information during voir dire. See, 3 J. Weinstein and M. Berger, *Weinstein's Evidence,* sec. 606[04] at 606–36 & 37 ("Rule 606(b) would not render a witness incompetent to testify to juror irregularities such as . . . possession of knowledge relevant to the facts in issue not obtained through the introduction of evidence but acquired prior to trial"), *Hard v. Burlington Northern Railroad,* 812 F.2d 482, 484–85 (9th Cir. 1987) ("[Juror] statements which tend to show deceit during voir dire are not barred by [Fed. Rule of Evid. 606(b)]."), *see also, Maldonado v. Missouri Pacific Railway Co.,* 798 F.2d 764, 770 (5th Cir. 1986), and *Tinsley v. Borg,* 895 F.2d 520, 524–26 (9th Cir. 1990).

In this case, both Relyea and Walsted testified that during voir dire they possessed, but failed to reveal, knowledge of Messelt's prior crimes. In Relyea's case, the information consisted of ten-year old "gossip" that Messelt had been accused of raping a young girl. Walsted obtained information about Messelt's prior convictions from a newspaper article.

The proper time to determine whether a juror is impartial is on voir dire examination. *McCoy v. Goldston,* 652 F.2d 654, 657 (6th Cir. 1981). Not only does the effective use of voir dire help ensure that the par-

ties receive a fair trial, it is a practical necessity given the costs which result when jury verdicts are challenged due to alleged bias which should have been revealed on voir dire. *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 555 (1984). The voir dire process relies on the accuracy of the responses provided by prospective jurors. There is, unfortunately, no way to guarantee that jurors will respond honestly. In addition, oftentimes a juror's inaccurate or incomplete responses are the products of oversight or confusion rather than a conscious attempt to mislead. "Called as they are from all walks of life, many [jurors] may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges." *Id.*

In *State v. Wyss,* 124 Wis. 2d 681, 370 N.W.2d 745 (1985) (overruled on other grounds by *State v. Poellinger,* 153 Wis. 2d 493, 451 N.W.2d 752 (1990), this court set forth a two-step test for courts to utilize when bias is alleged to have resulted from a juror's failure to reveal information on voir dire. In *Wyss,* we held that in order to be awarded a new trial in such instances, the movant must demonstrate:

> "(1)   that the juror incorrectly or incompletely responded to a material question on voir dire; and if so, (2) that it is more probable than not that under the facts and circumstances surrounding the particular case, the juror was biased against the moving party."

*Id.* at 726.

Messelt has satisfied the first part of this test with respect to Relyea and Walsted. During voir dire, Relyea failed to indicate that ten years earlier, she heard that Messelt had been accused of raping a young woman.

268

Similarly, Walsted did not reveal that he acquired at least some knowledge of Messelt's criminal record from a newspaper article. Therefore, pursuant to *Wyss,* we must determine whether, under the facts and circumstances of this case, Relyea and/or Walsted were biased against Messelt. *Id.* at 730.

The bias of a prospective juror can either be actual or implied. *Id.; State v. Louis,* 156 Wis. 2d 470, 478, 457 N.W.2d 484 (1990).[9] The question of whether a prospective juror is biased and should be dismissed for cause is a matter of the circuit court's discretion. *Louis,* 156 Wis. 2d at 478. The movant must offer more than a suggestion of partiality. *Nyberg v. State,* 75 Wis. 2d 400, 404, 249 N.W.2d 524 (1977). "A determination by the circuit court that a prospective juror can be impartial should be overturned only when bias is 'manifest.' " *Louis,* 156 Wis. 2d at 478–79.

Messelt does not claim, nor does the record indicate, that either Relyea or Walsted harbored actual bias. In addition, there is no evidence that Relyea or

[9] Section 805.08(1), Stats., lists a number of circumstances when jurors must be struck for cause. That section provides that:

> The court shall examine on oath each person who is called as a juror to discover whether the juror is related by blood or marriage to any party or to any attorney appearing in the case, or has any financial interest in the case, or has expressed or formed an opinion, or is aware of any bias or prejudice in the case. If a juror is not indifferent in the case, the juror shall be excused . . ..

In this case, none of these statutory indicators apply. Relyea and Walsted were not related to the parties or to the attorneys, they did not have a financial interest in the matter, neither had expressed or formed an opinion of Messelt's guilt, nor did either of them indicate that they were biased or prejudiced.

Walsted deliberately concealed information on voir dire.[10]

Essentially, then, Messelt's argument is that bias must be implied from the fact that prior to trial, Relyea and Walsted possessed certain information about Messelt's prior criminal activity. We disagree. First, both Relyea and Walsted swore on voir dire that they could be impartial. While we noted in *Louis* that juror expressions of impartiality are not conclusive in and of themselves, *Louis,* 156 Wis. 2d at 484, we also explained that evaluating a juror's sincerity is a task best left to the trial court's discretion. *Id. See, Amirault v. Fair,* 968 F.2d 1404 (1st Cir. 1992), "[a] trial court's findings on issues of juror credibility and honesty are determinations 'peculiarly within a trial judge's province.' " *Id.* at 1405, *(quoting Wainwright v. Witt,* 469 U.S. 412, 428 (1985)); *and* sec. 805.17(2), Stats.

Here, both on voir dire and at the postconviction hearing, the trial court believed that Walsted and Relyea could, and in fact did, serve as impartial jurors. This was due not only to that court's assessment of

---

[10] As we noted in *Wyss,* evidence that a juror purposefully gave an incorrect response, deliberately concealed information, or engaged in other mendacious conduct may be sufficient to find bias. *Wyss,* 124 Wis. 2d at 730–31. In this case, there is no evidence that Walsted responded dishonestly on voir dire. Moreover, during the postconviction hearing, the trial court explicitly found the same to be true of Relyea:

> **Court:**  This witness [Relyea] was asked these questions [on voir dire] and I indicate the witness was questioned quite thoroughly. I think she answered those questions that were put to her in the voir dire very honestly in light of the testimony she has given here today.
>
> **Defense Counsel:**  So do I.

their credibility, but also because of the nature of the pretrial knowledge they possessed. For instance, with respect to Relyea, the court found that:

> Mrs. Relyea had prior knowledge of Mr. Messelt's sexual assault or rape as she described it today and was described by her in the course of the voir dire. The Court was satisfied then and it is satisfied now that she considered that to be gossip, that it was not communicated to any of the other jurors during the course of the trial or deliberations that Mrs. Relyea considered by the Court. After an extensive voir dire by both the Court and Counsel, she was determined to be qualified and competent to serve on this jury and in that I remain convinced today that that was in fact true then and is true now and that the verdict in this case should not be now impeached by further inquiry.[11]

[11] We also note that while Relyea did not reveal her knowledge of Messelt's prior sexual assault during voir dire, the transcripts indicate that her responses put defense counsel on notice that she knew a great deal about the case:

Counsel: Can I ask you [Relyea] what you heard?

Relyea: Well, I'm a waitress and bartender, so, you know, in doing waitress and bartending work, you hear people talk, you know, regular talk, you're talking with somebody else and they have their opinion and he has their opinion, and they get discussing it, and naturally—I overhear lots of things.

Counsel: What have you heard about the case?

Relyea: Well pretty much what people read in the paper or heard on the radio.

Counsel: Could you be more specific if you can. What have you learned about how the sexual assault occurred?

Relyea: I heard she was tied up and sexually assaulted, and wore a stocking hat, cap, or something over his head, entered through a back window.

Counsel: Anything else?

Relyea: No.

Counsel: Did you hear anything about Mr. Messelt?

It is even more difficult to imply bias on Walsted's part. His testimony at the postconviction hearing, at least in regards to what he may have learned from the newspaper article, was muddled. On several occasions, he did indicate that he learned of Messelt's criminal record in the newspaper. Later, though, Walsted testified that, "I never really read the article as far as reading it. I seen it in the Melrose Chronicle but I actually never even read the article as far as reading it." When asked specifically what he remembered about the article, Walsted stated that, "I remember the name [Messelt] mentioned. Like I say, I never even read the article. I seen the headlines and that was it. I didn't read the article through at all. I had no idea what it was about." Finally, when asked whether he knew Messelt had a prior criminal record, Walsted answered, "I had heard it, yes, but I didn't know what it was for. I had no idea what it was for."[12] Upon this

Relyea: Yeah.
Counsel: What did you hear?
Relyea: Well I heard they thought it was him.
Counsel: And did you hear why they thought it was him?
Relyea: Supposedly his pickup, or the pickup that was seen driving down the road was one that he had been driving to the neighbors.

The record does not indicate that defense counsel attempted to strike Relyea from the panel.

[12] Walsted's testimony at the postconviction hearing was similar to the responses he provided on voir dire:

Counsel: Mr. Walsted, you have read an article in the Chronicle about this case?
Walsted: Yes, I did.
Counsel: Could you tell me, and be as specific as you can, what you remember about the details of that article?
Walsted: Well, to be truthful, I did not really get involved in the article whatsoever, I read it, and for right now as far as I can

record, and according proper deference to the trial court's discretion, we hold that the trial court did not erroneously exercise its discretion when it determined that bias on Relyea's and Walsted's part could not be implied from the pretrial information they possessed.[13]

say I can't really well—well I know somewhat details, but I do not—

Counsel: If you had to say what would you remember the details as being?

Walsted: Well I guess all I really recall is that I guess somewhat what had happened there that he had been charged, or not charged, said he broken into somebody's residence, and I guess I do remember a part of it that was something to do with the sexual assault.

Counsel: Do you remember how the sexual assault was to have happened?

Walsted: All I remember is that supposedly the victim was tied up, along with probably some weapon was involved. Other than that I can say that's all I remember. I read the article once.

Counsel: Did you notice from the article who was arrested?

Walsted: Yes, I did.

Counsel: And Mr. Messelt was not a stranger to you, so did the name stick out?

Walsted: I do not know—I know his dad, that's all I can say, I don't know—I know Bill, is it William, I don't know him personally whatsoever.

Counsel: O.K., do you know anything about Bill?

Walsted: No, I don't.

As with Relyea, the record does not reflect that defense counsel attempted to strike Walsted from the panel.

[13] Our holding in this regard reflects our understanding that neither Relyea nor Walsted shared the information they possessed with any other juror during the trial or deliberations.

We also note, and affirm, the trial court's finding that juror Young responded honestly during voir dire when he said that all he knew of Messelt's previous troubles related to school disciplinary problems. Because Young gave complete and accurate responses during voir dire, Messelt has not satisfied the first prong of the *Wyss* test with respect to Young.

Next, we review the testimony of those jurors which indicated that they came into possession of prejudicial extraneous information during the course of the trial. Section 906.06(2), Stats., does apply to their testimony. As the court of appeals noted, that statute establishes a general prohibition against the use of juror testimony to impeach a verdict. One commentator has described the scope of sec. 906.06(2)'s federal counterpart in the following manner: "It would have been hard to paint with a broader brush, and in terms of subject, Rule 606(b)'s exclusionary principle reaches everything which relates to the jury's deliberations, unless one of the exceptions applies." Christopher B. Mueller, *Juror's Impeachment of Verdicts and Indictments in Federal Court Under Rule 606(b)*, 57 Neb. L. Rev., Vol. 4, 920, 935 (1978). Federal courts interpreting Rule 606(b) generally share this expansive view. "It is well-established that a juror may not impeach the validity of the verdict after it is rendered, absent a showing that 'extraneous prejudicial information was improperly brought to the jury's attention or . . . any outside influence was improperly brought to bear upon any juror.' " *United States v. Gerardi,* 586 F.2d 896, 898 (1st Cir. 1978). *Tanner v. United States,* 483 U.S. 107, 121 (1987).

As its wording indicates, sec. 906.06(2), Stats., provides two limited exceptions to the rule against juror testimony. Those exceptions allow jurors to testify whether "extraneous prejudicial information was improperly brought to the jury's attention" or whether "any outside influence was improperly brought to bear upon any juror." Section 906.06(2).

This case requires us to interpret the first of these statutory exceptions. Specifically, we must determine whether the testimony of Szymanski, Walsted (with

274

respect to the conversation at Mrs. Hanson's home), or Gebhardt falls within this exception. In this analysis, Messelt bears the burden of proving that the jurors' testimony concerns extraneous information, that this information was improperly brought to the jury's attention, and that the extraneous information was potentially prejudicial. *Poh,* 116 Wis. 2d at 520.

"Extraneous" information is information which a juror obtains from a non-evidentiary source, other than the "general wisdom" we expect jurors to possess. *Poh,* 116 Wis. 2d at 521. It is information "coming from the outside." *State v. Shillcutt,* 119 Wis. 2d 788, 798, 350 N.W.2d 686 (1984). The term does not extend to statements which simply evince a juror's subjective mental process. *Id.* at 807 (Heffernan, C.J., concurring).

The information possessed by Szymanski was extraneous. His testimony indicated that he learned about Messelt's prior convictions from a co-worker.

With respect to Walsted, the trial court found it likely that he overheard some of the conversation between his father and Mrs. Hanson.[14] Moreover, according to Mrs. Hanson's statement, that conversation included a reference to Messelt's prior criminal convictions and a remark by Walsted's father that Messelt should be castrated. Although the trial court found

---

[14] The trial court concluded the following with respect to the conversation that took place in Mrs. Hanson's kitchen:

Mr. Walsted's case presents a difficult problem for the court. Again, at some point in these proceedings it's clear that Mr. Walsted was confronted with a situation where extraneous information was being discussed in his presence. I find that it's very difficult to believe that one can be in the presence of two other people in the kitchen of somebody's personal residence and close your ears and not hear what is being said.

275

Mrs. Hanson's evidence quite suspect,[15] we will, for purposes of determining competency, assume that some extraneous information was communicated to Walsted during that conversation.

Gebhardt's testimony, on the other hand, does not reveal that extraneous information reached the jury. As noted, the testimony merely reflects one juror's common sense inference that the reason the police came to suspect Messelt was because he must have been in trouble before. The juror who made this remark did not introduce any extraneous facts into the jury's deliberations. In effect, Gebhardt's testimony simply provides evidence of one juror's subjective mental processes. The authorities are in "virtually complete accord" that such evidence is inadmissible. *See* Original Advisory Committee's Note on Rule 606(b) of the Federal Rules of Evidence.

The exception in sec. 906.06(2) Stats., relating to extraneous information applies only to that information which can also be characterized as "prejudicial." The level of prejudice required for purposes of determining competency under sec. 906.06(2) is necessarily lower than prejudice needed to successfully impeach a verdict. See, *Poh,* 116 Wis. 2d at 530 (Evidence of extra-

---

[15] Here is how the trial court characterized Mrs. Hanson's evidence:

> I don't think the evidence is clear as to exactly what was said in Mr. Walsted's presence. Knowing Mrs. Hanson, I don't believe that if you had talked to her 15 minutes after she had the conversation with Mr. Walsted that she would have been able to relate to you accurately what the conversation was and that was born (sic) out by her appearance in the court here today, but the fact is establishing—Mr. Walsted admitted under oath that some conversation concerning this case did, in fact, take place at the Hanson residence during the time that this matter was before the Court.

neous information which was competent under sec. 906.06(2), Stats., must still establish "reasonable possibility" that evidence would prejudice average juror.).

Here, the extraneous information Szymanski acquired with respect to Messelt's prior convictions was potentially prejudicial. That cannot be disputed. It is more difficult, however, to evaluate the prejudicial nature of the extraneous information Walsted may have acquired. As we have noted, the record does not clearly indicate what that information was. Still, Walsted's testimony was offered for the purpose of determining whether he was exposed to prejudicial information, most notably, whether he overheard mention of Messelt's prior convictions. Because any such information would have been potentially prejudicial, we believe that Walsted was competent to testify about what he did or did not hear that evening.

The real question with respect to the testimony of Szymanski and Walsted is whether the extraneous information they possessed was "improperly brought to the jury's attention." The court of appeals believed this statutory language prevents jurors from testifying about extraneous prejudicial information unless that information was communicated to all twelve jurors. Relying upon the trial court's finding that Szymanski and Walsted did not communicate the extraneous prejudicial information they possessed to any other jurors, the court of appeals held that sec. 906.06(2) rendered their testimony incompetent.

The court of appeals' holding in this respect need not detain us long. In this state, criminal defendants have the right not only to an impartial jury, but also to a unanimous verdict. *State v. Lomagro,* 113 Wis. 2d 582, 335 N.W.2d 583 (1983). Together, these rights

entitle defendants to have their case tried by twelve impartial jurors. Material prejudice on the part of even a single juror can impair these rights. *After Hours,* 108 Wis. 2d at 734.

Under the court of appeals' interpretation of sec. 906.06(2), Stats., eleven jurors could discuss amongst themselves extraneous information of the most prejudicial nature, and yet not be competent to testify because, for some reason, the twelfth juror was excluded from their conversations. Such a result might be acceptable if defendants were entitled to only one impartial juror. But defendants are entitled to more than one impartial juror. They are entitled to twelve. This court will not adopt any statutory interpretation which renders meaningless a party's most basic constitutional rights.[16]

The state acknowledges that the court of appeals' interpretation of sec. 906.06(2), Stats., is untenable. In its place, the state would have us adopt a construction that, while not requiring that extraneous information be communicated to all twelve jurors, would require

---

[16] In *Poh,* this court held that jurors were competent to testify even though at least two jurors indicated they had not heard the prejudicial remark. *Poh,* 116 Wis. 2d at 521. Numerous federal cases, both prior to and following the adoption of Rule 606(b) of the Federal Rules of Evidence allow juror testimony even where the extraneous information is communicated to less than the entire jury. See, e.g., *Jeffries v. Blodgett,* 5 F.3d 1180 (9th Cir. 1993), *United States v. Bruscino,* 687 F.2d 938 (7th Cir. 1982), *Mayhue v. St. Francis Hospital of Wichita, Inc.,* 969 F.2d 919 (10th Cir. 1992), *United States v. Perkins,* 748 F.2d 1519 (11th Cir. 1984), *Dickson v. Sullivan,* 849 F.2d 403 (9th Cir. 1988), *United States v. Littlefield,* 752 F.2d 1429 (9th Cir. 1985), *Parker v. Gladden,* 385 U.S. 363 (1966).

that the information at least be communicated to one other juror.

Some courts have adopted the "communication" requirement advanced by the state. For example, in *United States v. Eagle,* 539 F.2d 1166 (8th Cir. 1976), *cert. denied,* 429 U.S. 1110 (1977), the court held that Rule 606(b) of the Federal Rules of Evidence prevents jurors from testifying about extraneous prejudicial information unless the juror communicated that information to other jurors. *Id.* at 1170. The court believed that such a "communication" requirement would prevent fraud on the part of individual jurors by limiting their testimony to "overt acts susceptible to the knowledge of other jurors." *Id.*

The policy concerns expressed in *Eagle* are valid. The question for this court is whether they are so significant as to overwhelm the criminal defendant's constitutional rights. We conclude they are not. As already indicated, criminal defendants are entitled to twelve impartial jurors. When prejudice or bias exists on the part of any one juror, that right is impaired.

The state's "communication" requirement, moreover, can lead to unjustifiable results. Take for instance a situation where during trial, all twelve jurors independently read a newspaper article which incorrectly attributes to the defendant a series of vicious crimes. There is little doubt that such information is potentially prejudicial. Nevertheless, the state's interpretation of sec. 906.06(2), Stats., would prevent the jurors from testifying unless it can be established that at least one juror communicated his or her knowledge of the article to another juror. An inflexible rule such as the state suggests does not "accommodate" the competing ideals of justice and finality, but rather exalts the latter over the former.

279

The better construction of sec. 906.06(2), Stats., is to allow trial courts the discretion to investigate allegations that extraneous prejudicial information affected the verdict irrespective of whether a juror communicated that information to even one other juror. The trial court conducts the voir dire, listens to the trial evidence, and observes the jurors. It is in the best position to judge the "materiality of the extraneous material, and its prejudicial nature." *United States v. Bagnariol,* 665 F.2d 877, 885 (9th Cir. 1981). Therefore, we elect not to impose the "communication" requirement advanced by the state.[17]

Finally, Mrs. Hanson's statement was admissible. As the court of appeals correctly noted, sec. 906.06(2) does not prevent non-jurors such as Mrs. Hanson from testifying.

To summarize, we find that sec. 906.06(2) does not apply to Relyea's testimony, or to that portion of Walsted's testimony relative to the information he obtained through the newspaper article. The record indicates that these jurors possessed, but failed to reveal this information, at the time of voir dire. Because their failure in this regard was not due to dishonesty or any reason indicative of bias, and because they did not communicate this information to

---

[17] See, *Dickson v. Sullivan,* 849 F.2d 403, 406 (9th Cir. 1988) (courts must consider prejudicial impact of extraneous information even when just one juror was exposed to extraneous information relating to defendant's previous prosecution for a similar offense.); *United States v. Eubanks,* 591 F.2d 513, 517 (9th Cir. 1979) ("Even if 'only one juror is unduly biased or prejudiced,' the defendant is denied his constitutional right to an impartial jury." *quoting, United States v. Hendrix,* 549 F.2d 1225, 1227 (9th Cir. 1977)).

the other jurors, Messelt cannot cite their knowledge as the basis for a new trial.

Section 906.06(2), Stats., does govern Szymanski's testimony, and his testimony is competent under that statute. Similarly, Walsted's testimony with respect to the conversation in Mrs. Hanson's kitchen is competent as well. Gebhardt's testimony is not competent under sec. 906.06(2), however, because it impermissibly offers evidence of a juror's subjective mental processes. Finally, Mrs. Hanson's statement was properly admitted into evidence.

After determining whether testimony is competent under sec. 906.06(2), Stats., courts must conduct two additional analyses prior to deciding whether a new trial is warranted. First, the trial court must determine by clear, satisfactory and convincing evidence that the juror made or heard the statements or engaged in the conduct alleged. *After Hour Welding,* 108 Wis. 2d at 742. Only if the evidence is clear, satisfactory and convincing must the court then make the legal determination of whether the extraneous information constitutes prejudicial error requiring reversal of the verdict. *After Hour Welding,* 108 Wis. 2d at 741; *Poh,* 116 Wis. 2d at 524.

Szymanski's testimony satisfies the first of these inquiries. The trial court found that the evidence clearly revealed that during the course of the trial, Szymanski learned about Messelt's prior criminal convictions. That fact is undisputed. As a result, we must determine whether as a matter of law, the information in Szymanski's possession constitutes prejudicial error requiring reversal of the verdict. That question is a matter of law which this court decides without defer-

281

ence to the trial court's determination. *After Hour Welding,* 108 Wis. 2d at 741. Generally, that analysis will focus on whether there is a reasonable possibility that the information in Szymanski's possession would have a prejudicial effect upon a hypothetical average juror. *Poh,* 116 Wis. 2d at 523–25. In this case, however, that test is inapplicable for the simple reason that none of the jurors that deliberated on Messelt's verdict had access to this information. Szymanski did not share his knowledge with any other juror, nor, as an alternate did he participate in the jury's deliberations. As a matter of law, we hold that the information in Szymanski's possession could not have had a prejudicial effect on Messelt's verdict.

The remaining competent evidence pertains to the discussion that occurred in Mrs. Hanson's kitchen. At the postconviction hearing, Walsted, under oath, flatly denied hearing any of the conversation. In addition, the trial court, as noted, was very dubious as to Mrs. Hanson's ability to accurately recall the details of what was discussed. After hearing this testimony, the trial court found that the evidence was *not* clear as to what was said that evening in Walsted's presence. The trial court's finding in this regard will be affirmed unless clearly erroneous. Section 805.17(2), Stats. Our review of the record confirms the trial court's determination that the evidence pertaining to the conversation in Mrs. Hanson's home is simply too ambiguous and disputed so as to justify a new trial.

In fact, the trial court's handling of Messelt's allegations of juror bias was altogether appropriate. The court considered Messelt's motion, exercised its discretion to allow Messelt to question the jurors at the postconviction hearing, listened to this testimony, and then concluded that Messelt had received a fair trial.

For the reasons stated above, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting).* No one questions that juror Relyea, although honest, "incorrectly or incompletely responded to a material question on voir dire." *State v. Wyss,* 124 Wis. 2d 681, 726, 370 N.W.2d 745 (1985), *overruled on other grounds, State v. Poellinger,* 153 Wis. 2d 493, 506, 451 N.W.2d 752 (1990). In the exchange shown in the margin at note 10 of the majority opinion, defense counsel asked the juror six times what she had heard about the defendant. In her seven responses to this question, the juror failed to tell the court that she had heard the defendant had been accused of raping a young girl. The juror explained her silence by saying that what she heard was only gossip, that she did not know for sure.

Similarly, in this case, Juror Walsted was questioned in voir dire about the details of the newspaper article he said he had read about the case. He was able to recall from the article that the crime involved a residential break-in and a sexual assault. However, he did not add that he had also learned from the article that the defendant had a prior criminal record, despite his testimony at the post-conviction hearing that he knew about the defendant's record at the time he was sworn in.

A defendant's right to be tried by a fair and impartial jury is guaranteed by the Sixth and Fourteenth Amendments to the federal constitution and by the state constitution. The voir dire process is the primary mechanism for spotting possible juror bias and identi-

fying jurors who have acquired information about a case through pre-trial publicity. Trial courts and parties ask prospective jurors to explain what they already know about the facts of a case to identify bias that might not be subjectively evident to a juror. When prospective jurors provide incomplete or inaccurate information in voir dire, the process of selecting a fair and impartial jury is undermined. Of course jurors, like all human beings, can forget to mention information that the court or the parties might consider relevant. Such omissions are not grounds for a new trial. In this case, however, the information is per se prejudicial.

Clearly, a prospective juror's knowledge of a defendant's prior criminal conduct is relevant information to the process of selecting a fair and impartial jury in a criminal case. The rule generally prohibiting the introduction of evidence of other crimes is based on the fact that the evidence apparently has too much probative value. As Wigmore has stated, "the natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited and either allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation irrespective of the accused's guilt of the present charge." 1A Wigmore on Evidence, sec. 58.2, p. 1212 (Tillers rev. 1983). *See also Fischer v. State,* 226 Wis. 390, 402, 276 N.W. 640 (1937).

Thus the information known to jurors Relyea and Walsted was of a nature so prejudicial that it could not have been admitted as evidence at trial. Under the established practice of the federal court system, a juror who is aware of a defendant's prior criminal record is presumed to be prejudiced and should be excused for

cause.[1] In *Marshall v. United States,* 360 U.S. 310 (1959), seven of the jurors had read newspaper articles during the trial reporting the defendants' two previous felony convictions. Each of the seven told the judge that he would not be influenced by the news articles, that he could decide the case only on the evidence in the record, and that he felt no prejudice against the defendant as a result of the articles. The United States Supreme Court ordered a new trial, noting that the jurors had been exposed "to information of a character which the trial court ruled was so prejudicial that it could not be directly offered as evidence. The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence. . . . It may indeed be greater for it is then not tempered by protective procedures." *Id.* at 312–313.

I propose that this court adopt the *Marshall* rule. I conclude that, had the two jurors in this case made full disclosure at the voir dire, they would have been subject to challenge for cause and the trial court should have excused them. This court has said that "because it preserves the appearance as well as the reality of an impartial trial, it is a good rule for the trial judge to honor challenges for cause whenever [the judge] may reasonably suspect that circumstances outside the evidence may create bias on the part of the challenged juror." *Kanzenbach v. S.C. Johnson & Son, Inc.,* 273 Wis. 621, 627, 79 N.W.2d 253 (1956). The trial court should have excused jurors who were aware of the defendant's criminal record which would not have been admissible at trial.

---

[1] *Britz v. Thieret,* 940 F.2d 226, 231 (7th Cir. 1991). *See also* James J. Gobert, Jury Selection 7.16 (1993 Cum. Supp.).

At a minimum, under the *Wyss* case, if a juror's "correct response to the question would have provided a valid basis for a challenge for cause,"[2] the defendant has been prejudiced and a new trial is required.[3]

In this case, although both jurors in all honesty thought they could be fair, it should be conclusively presumed, as a matter of law, that there was a substantial possibility that jurors Relyea and Walsted were influenced by the extrajudicial information. Because these jurors could have been challenged for cause based on the highly prejudicial nature of the informa-

[2] This is the *McDonough* test. *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548 (1984). *See Wyss,* 124 Wis. 2d at 726. The *Wyss* court concluded that *McDonough* set forth too stringent a standard and apparently adopted a standard more favorable to the moving party. 124 Wis. 2d at 728–729.

[3] Beyond this test, *Wyss* sets forth a variety of standards for determining the prejudicial effect of the lack of juror candor in various ways: "[I]t is more probable than not that under the facts and circumstances surrounding the particular case, the juror was biased against the moving party," 124 Wis. 2d at 726; "the party seeking the new trial . . . must prove bias or prejudice," 124 Wis. 2d at 727; "the chief consideration . . . is whether the defendant was prejudiced," 124 Wis. 2d at 727; "the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred," 124 Wis. 2d at 729; "bias may be inferred from surrounding facts and circumstances," 124 Wis. 2d 730; the court must inquire as to whether there was "a showing of bias or prejudice as to require a new trial," 124 Wis. 2d at 725, or whether the lack of response "resulted in probable prejudice to the movant," 124 Wis. 2d at 727; the court must also determine whether "the prospective juror 'has expressed or formed an opinion, or is aware of any bias or prejudice in the case,' " 124 Wis. 2d at 730.

tion they possessed, I conclude that a new trial is required.

For the reasons set forth, I dissent.